Stewart L. **UDALL**, Secretary of the Interior, and Karl E. Landstrom, Director, Bureau of Land Management, Appellants,

v.

Richard L. **OELSCHLAEGER**, Appellee.

No. 21127.

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 11, 1967.

Decided Jan. 23, 1968.

Mr. John G. Gill, Jr., Attorney, Department of Justice, with whom Asst. Atty. Gen. Edwin L. Weisl, Jr., Acting Asst. Atty. Gen. J. Edward Williams and Mr. Roger P. Marquis, Attorney, Department of Justice, were on the brief, for appellants.

Mr. James W. McDade, Washington, D. C., with whom Mr. Samuel W. McIntosh, Washington, D. C., was on the brief, for appellee.

Before BURGER, WRIGHT and McGOW-AN, Circuit Judges.

McGOWAN, Circuit Judge:

Appellee sued in the District Court to compel the issuance to him of a final certificate and patent with respect to a homestead upon which he had made entry. The District Court, hearing the case on cross-motions for summary judgment, denied both without opinion, but remanded the case to the Interior Department on terms which in substance gave appellee the relief he sought. Appellants assert upon this appeal that neither of the two possible foundations of the District Court's action are adequate. We agree.

## I

The land in question is in Alaska, lying near the seacoast. It was settled by appellee in 1954, prior to the filing later in that year of the Government's first official survey of the area in which the land lies. Appellee's final proofs of entry were filed in mid-1955. On November 19, 1956, his application for final patent was turned down by the Anchorage Land Office on the ground that the land in question had been withdrawn from entry by Public Land Order 576, which had been issued by the Secretary of the Interior in 1949. Two administrative appeals to successively higher authority within the Department were unavailing.

In those appeals the principal issue was the proper construction to be placed upon the language of Public Land Order 576. It purported to withdraw from appropriation under the public land laws an 11-mile area "parallel to and one mile distant from the line of mean high tide of Turnagain Arm." Turnagain Arm is an inlet of the ocean. The Interior Department construed "the line of mean high tide" to mean the surveyor's meander line.[1] Appellee insisted that the phrase embodied a concept identified by the Supreme Court in Borax, Ltd. v. City of Los Angeles, 296 U.S. 10, 56 S.Ct. 23, 80 L.Ed. 9 (1935), that is to say, the precise average of all the high tides over a complete lunar cycle (18½ years) as determined by the United States Coast and Geodetic Survey. Although this latter line has not as yet been determined, and cannot be for some time yet because a lunar cycle has not been completed, appellants assume for present purposes only that all of the land claimed by appellee lies beyond the one-mile strip as measured from such a line. If the meander line is used, how-

---

1. The Government in its brief has adequately described a meander line as "a series of straight lines run by a surveyor along the physical evidence of the high tide, the escarpment and edge of vegetation wherever the public lands meet a navigable body of water."

ever, the homestead lies in the withdrawn area.

Appellee filed suit in 1960. Once dismissed for lack of prosecution but reinstated, the action finally reached trial in February, 1967. The District Court remanded the matter to the Department with directions that the so-called *Borax* line, as contended for by appellee, be used in determining whether the homestead was or was not within the area withdrawn by Public Land Order 576.

## II

■ The central issue is that of the rationality of the construction placed by the Interior Department upon its own order. We must of necessity approach that issue in an acute consciousness of the Supreme Court's recent reminder of the deference due the Secretary's reading of his own words. Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). Although one may wonder on occasion whether that doctrine encourages the kind of careful draftsmanship which might obtain in its absence, it does serve other important public purposes. In any event, it is, as we recently said in Robertson v. Udall, 121 U.S.App. D.C. 218, 221, 349 F.2d 195, 198 (1965), "[O]ur duty to defer to the Secretary's interpretation of his own regulations, so long as that interpretation is not plainly beyond the bounds of reason or authority, is well-defined. \* \* \*" See also Duesing v. Udall, 121 U.S.App.D.C. 370, 374, 350 F.2d 748, 752, cert. denied, 383 U.S. 912, 86 S.Ct. 888, 15 L.Ed.2d 667 (1965).

■ The question for us, therefore, as it was for the District Court, is not whether plausible grounds can be advanced for each of the contending constructions, but whether the one espoused by the Secretary is beyond the bounds of reasonableness. If it is not, his view prevails, even though appellee's arguments are not without substance. This precedence derives from the rights which appropriately go with the great official responsibilities inherent in the adminis-

tration of the public lands. We recognize them here.

Appellants have advanced a number of considerations which they regard as providing a more than ample underpinning of rationality for the Departmental construction. We do not think it necessary to advert to them all, since one alone seems to us sufficient to turn aside a claim of utter arbitrariness. The problems giving rise to this litigation have their origin mainly in the fact that, when Public Land Order 576 was issued and when appellee made his entry, the area involved had not been officially surveyed. Accurate demarcation of any property interests in the area could, accordingly, be made only after an official plat was forthcoming. The land area just to the north had, however, been surveyed, and points on that survey were used to define the area to be withdrawn. Thus it was that Public Land Order 576 described one of the boundaries of the withdrawn area in this fashion:

> Northwesterly, 11 miles along line of mean high tide of Turnagain Arm to meander corner on south boundary of section 32, T.12 N., R. 3W.

■ This reference to "meander corner" is, we think, significant. It is a point where a boundary line intersects a meanderable body of water; and it provides a normal point of departure for a new meander line. Since the area to the north had been surveyed by the running of a meander line on its seaward side, the use of the base point of the "meander corner" suggests that the withdrawal order contemplated a continuance of the meander line down the coast to the south. Had a *Borax* line been intended, it would in all certainty have been substantially off the "meander corner," whereas the quoted language appears to assume that the "line of mean high tide" will intersect that "corner." References to other platted points in the withdrawal order, when considered in relation to the one-mile distance involved, also dovetail with the meander line of vegetation rather than with a line computed from tidal averages.

■ There is, of course, no question but that the Supreme Court in *Borax* referred to a line of this latter nature in the very terms used in Public Land Order 576, that is to say, as a "line of mean high tide." But the issue here is not whether there is such a concept, but whether that concept was intended to be reflected in those words as they appear in the withdrawal order. *Borax* does not govern this issue, since it was concerned with vastly different matters, *i. e.*, the determination of boundaries as between tideland owners, on the one hand, and upland owners, on the other. The fact that the Court decided to utilize the tidal average concept to resolve this ownership dispute does not conclude the issue of language construction presented to us by a private claim against the public domain.

### III

Although we have no way of knowing whether the District Court responded affirmatively to it, an estoppel argument was pressed in that court and is renewed upon appeal. It rests upon the circumstance that in September, 1953, two final homestead patents were issued to other persons covering lands in the area which appellants now insist was withdrawn by the 1949 order. Appellee contends that appellants, having done for others what they now say they can not do for appellee, are estopped from denying appellee his patent.

■■ Apart from the general rule that the Government is never disabled from protecting the public interest by reason of the past mistakes of its agents (see Utah Power and Light Co. v. United States, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1916)), we do not think a true estoppel is to be found in this record. In the first place, there is no showing that appellee acted in reliance upon these or other acts of the Government, and, indeed, the record indicates that appellee was warned that he could not be sure that he was outside the withdrawn strip. Secondly, the issuance of the two patents occurred before the official survey was made, and before anyone could tell with certainty where the withdrawn area was. It may have been improvident for these patents to have issued (and appellants freely characterize it as mistaken); but their issuance could not under the circumstances be taken as any express or implicit representation as to the location of the reserved lands. The fact is that, until the survey was made, Government and homesteader alike acted at their peril in issuing or seeking homesteads in this vicinity.

The judgment appealed from is reversed, and the case is remanded with directions to enter judgment for appellants.

It is so ordered.