KOCH INDUSTRIES, INC., Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent.

No. 75–1094.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 9, 1976.

Decided Feb. 4, 1977.

---

Robert J. Haggerty, Washington, D. C., with whom Frederick J. Hansen, Gen. Counsel, Koch Industries, Wichita, Kan., was on the brief, for petitioner.

John H. Burnes, Jr., Atty., Federal Power Commission, Washington, D. C., with whom Drexel D. Journey, Gen. Counsel, Robert W. Perdue, Deputy Gen. Counsel, and Allan Abbot Tuttle, Sol., Federal Power Commission, Washington, D. C., were on the brief, for respondent.

Before BAZELON, Chief Judge, ROBINSON, Circuit Judge, and JUSTICE,[*] United States District Judge for the Eastern District of Texas.

Opinion for the Court filed by SPOTTSWOOD W. ROBINSON, III, Circuit Judge.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Our charge is to review a determination by the Federal Power Commission on the entitlement of a sale of natural gas first delivered in 1974, but produced from wells tapping reservoirs discovered in 1972 within acreage dedicated to the interstate market in 1964 and supplying other gas thereto prior to 1973, to the national rate prescribed by the Commission in its Opinion No. 699 and supplementing decisions [1] as a "sale[ ] . . . initiated on or after January 1, 1973." [2] Petitioner, Koch Industries, Inc., contends that the sale qualifies in consequence of policy formulated in the Commission's Opinion No. 567,[3] and of an explicit provision of its Opinion No. 699–A [4] particularly as interpreted in a subsequent Commission order.[5] The Commission rejected petitioner's argument and disallowed the national rate.[6] We affirm the Commission.

I

In Opinion No. 699, issued June 21, 1974, the Commission established nationwide just and reasonable rates collectible upon certain kinds of natural-gas sales in interstate commerce.[7] "New sales"—those of gas not previously sold in interstate commerce, made under contracts executed on or after January 1, 1973—comprise a class to which the new rates are applicable.[8] By the Commission's original formulation, in Opinion No. 699, that class consisted in "sales of natural gas in interstate commerce . . pursuant to contracts executed on or after January 1, 1973, for the sale of natural gas in interstate commerce for gas not previously sold in interstate commerce except

---

[*] Sitting by designation pursuant to 28 U.S.C. § 292(d) (1970).

1. *Uniform National Rate for Sales of Natural Gas* (Opinion No. 699), 51 F.P.C. 2212 (1974), as amended by Opinion No. 699–A (amending opinion), 52 F.P.C. 263 (1974), and Opinion No. 699–H (opinion on rehearing), 52 F.P.C. 1604 (1974), *aff'd sub nom. Shell Oil Co. v. FPC*, 520 F.2d 1061 (1975), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2661, 49 L.Ed.2d 394 (1976), *on rehearing*, 525 F.2d 1261 (1976). Other Commission opinions further revising Opinion No. 699 are not relevant to the issue presented, and for that reason are not cited.

2. Neither of the two Commission letter-orders incorporating its decision is reported. They are reproduced in the Joint Appendix (J.App.) at 92–93, 118–119, respectively.

3. *Hugoton-Anadarko Area Rate Proceeding* (Opinion No. 567), 42 F.P.C. 726, *clarified and rehearing denied*, 42 F.P.C. 1062 (1969), *clarified*, 43 F.P.C. 222 (1970).

4. *Uniform National Rate for Sales of Natural Gas* (Opinion No. 699–A), *supra* note 1, 52 F.P.C. at 265 (amending opinion).

5. *High Crest Oils, Inc.*, No. RI 74–79 (F.P.C. Aug. 30, 1974) (unpublished), Brief for Commission, Appendices (Comm'n Apps.) A, B.

6. J.App. 92–93, 118–119.

7. *Uniform National Rate for Sales of Natural Gas* (Opinion No. 699), *supra* note 1.

8. 51 F.P.C. at 2301. The new rate was also made applicable to sales from "new wells"—those commenced on or after January 1, 1973 —and to sales pursuant to "replacement contracts"—those executed on or after January 1, 1973, replacing contracts expiring by their own terms on or after that date. *Id.* Neither of the last two categories is pertinent to the case at bar.

pursuant to" provisions not relevant to this case.[9] Later, by Opinion No. 699–A issued August 2, 1974, the definition of the class was amended to read "sales initiated on or after January 1, 1973, for the sale of natural gas in interstate commerce for gas not previously sold in interstate commerce."[10] Still later, by Opinion No. 699–H issued December 4, 1974, the definition was again recast to specify "[s]ales of natural gas in interstate commerce for resale . . . made pursuant to contracts for the sale of natural gas in interstate commerce for gas not previously sold in interstate commerce prior to January 1, 1973 . . . where such sales are initiated on or after January 1, 1973."[11] The Commission's regulations have since incorporated that definition in identical language,[12] and have further provided:

> In all areas, the rate for natural gas produced from a reservoir discovered on or after January 1, 1973, which is located upon acreage previously dedicated to interstate commerce under a contract dated prior to January 1, 1973, shall be determined by the date of discovery of such reservoir, in lieu of the contract date.[13]

Petitioner produces, and sells in interstate commerce, natural gas from the Lake St. Catherine Field in Orleans Parish, Louisiana. The acreage from which the gas is taken is part of a larger tract which was committed to the interstate market by a predecessor of petitioner through a contract dated September 2, 1964,[14] and deliveries under that contract were made long prior to January 1, 1973.[15] The reservoirs from which petitioner's gas is extracted were not discovered until 1972.[16] The wells producing petitioner's gas were drilled during 1970–71 and completed in 1972,[17] but were not connected to the gathering system until 1974.[18] Consequently, no gas from the newly-discovered reservoirs was actually delivered until then.

On September 20, 1974, petitioner filed with the Commission a notice of a change in its schedule covering the gas, proposing a rate-raise to the national ceiling. Petitioner based its claim to the increase upon the language of Opinion No. 699–A conferring the national rate upon "sales initiated on or after January 1, 1973, for the sale of natural gas in interstate commerce" where no such gas has been previously sold in interstate commerce.[19] By a letter-order dated October 17, 1974, the Commission rejected

9. *Uniform National Rate for Sales of Natural Gas* (Opinion No. 699), *supra* note 1, 51 F.P.C. at 2301.

10. *Uniform National Rate for Sales of Natural Gas* (Opinion No. 699–A), *supra* note 1, 52 F.P.C. at 265 (amending opinion).

11. *Uniform National Rate for Sales of Natural Gas* (Opinion No. 699–H), *supra* note 1, 52 F.P.C. at 1650–1651 (opinion on rehearing).

12. 18 C.F.R. § 2.56a(a)(2)(ii) (1976).

13. 18 C.F.R. § 2.56a(k)(1) (1976).

14. The contract effecting the dedication was between Barnwell Production Company as seller and Southern Natural Gas Company as purchaser. It obligated Barnwell to sell to Southern all gas produced on the subject acreage— three leasehold areas comprising some 1,000 acres—and to apply to the Commission for a certificate of public convenience and necessity authorizing the sale. On February 8, 1965, the Commission issued the required certificate. *Barnwell Prod. Co.*, 33 F.P.C. 1316 (1965). Production from five wells began about 1965 but only a portion of Barnwell's acreage was developed.

On December 18, 1970, petitioner and others obtained from Pecos Western Corporation, Barnwell's successor, an assignment of part of the Barnwell tract. During 1970–71, two productive wells were drilled on the acquired acreage. New reservoirs were discovered—as determined by the Louisiana Department of Conservation, as of June 1, 1972. The gas produced by these two wells—the subject of this litigation—emanates from reservoirs different from those previously tapped by petitioner's predecessor. The two wells were completed by mid-1972, but the gathering facilities did not become operational until 1974, and the first deliveries occurred in May of that year.

15. See note 14 *supra*.

16. See note 14 *supra*.

17. See note 14 *supra*.

18. See note 14 *supra*.

19. See text *supra* at note 10.

petitioner's rate-change notice.[20] The Commission pointed out that the acreage producing petitioner's gas had been dedicated to interstate commerce under a 1964 contract and that deliveries therefrom had begun before January 1, 1973. The Commission held that its "Opinion No. 699 relating to sales initiated on or after January 1, 1973, pertain [sic] to contracts where the initial sales thereunder was [sic] initiated on or after January 1, 1973,"[21] and that "the date that initial deliveries were made under the September 2, 1964, contract is controlling and not the date that sales were initiated by" petitioner.[22] The Commission informed petitioner that its action was without prejudice to a refiling for the national rate should it be found acceptable upon a rehearing of Opinion No. 699.

On November, 1974, petitioner submitted an application for a rehearing of the ruling as to it. Acknowledging that the subject acreage was committed to interstate commerce by the 1964 contract and that gas was delivered thereunder prior to 1973, petitioner insisted that its sale commanded the national rate because deliveries from the new wells producing its gas did not commence until 1974. Petitioner sought to buttress its position by urging the interaction of three factors. One was the Commission's policy, earlier established in Opinion No. 567, of pricing gas obtained from newly-found reservoirs on previously dedicated acreage on the basis of the discovery date rather than the contract date.[23] Another was the specific language of Opinion No. 699–A respecting new sales, to which we have already adverted.[24] Still another factor was the interpretation placed on Opinion No. 699–A by the Commission's *High Crest* order,[25] which we will later have occasion to discuss.[26] On December 13, 1974, the Commission denied rehearing,[27] in its letter-order explaining:

> You are not entitled to the national rate ceiling under Opinion No. 699 based on the policy established in Opinion No. 567 with respect to sales from newly discovered reservoirs. Opinion No. 699 did not include within its coverage sales from newly discovered reservoirs unless such sales were otherwise covered by that opinion. Moreover, even under Opinion No. 699–H which modified Opinion No. 699 to include within its coverage sales from reservoirs discovered on or after January 1, 1973, your sales would not be covered inasmuch as the reservoir from which such sales are made was discovered prior to January 1, 1973. Your application, as supplemented, sets forth no new facts or principles of law which were not fully considered in the October 17, 1974, letter order, or which, having now been considered, warrant any modification of that order. Accordingly, your petition for rehearing is denied.[28]

20. J.App. 92–93.

21. J.App. 92.

22. J.App. 92.

23. *Hugoton-Anadarko Area Rate Proceeding* (Opinion No. 567), *supra* note 3, 42 F.P.C. at 729–730, 732–734.

24. See text *supra* at note 10.

25. *High Crest Oils, Inc., supra* note 5, Comm'n Apps. A, B.

26. See text *infra* at notes 53–56.

27. Petitioner had requested alternatively the "new gas" ceiling rate which the Commission had earlier set for the Southern Louisiana Area by Opinion No. 598. *Southern Louisiana Area Rate Proceeding* (Opinion No. 598), 46 F.P.C. 86, 105, 134–139, 142–143 (1971), *clarified on rehearing*, (Opinion No. 598–A), 46 F.P.C. 633 (1971), *aff'd sub nom. Placid Oil Co. v. FPC*, 483 F.2d 880 (5th Cir. 1973), *aff'd sub nom. Mobil Oil Corp. v. FPC*, 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974). There the Commission extended that rate to gas produced from "newly discovered reservoirs discovered on or after October 1, 1968." 46 F.P.C. at 143; 18 C.F.R. § 154.105(c)(2) (1976). Since the reservoirs containing petitioner's gas were discovered in 1972, the Commission found that petitioner's "application for rehearing is consistent with the Commission's policy enunciated in Opinion No. 567 concerning newly discovered reservoirs," and approved the rate established therein for petitioner. J.App. 118. No issue respecting that aspect of the Commission's order is raised here.

28. J.App. 118.

## II

Petitioner's gas qualifies for the national rate only if it is the subject of a "sale[] . . . initiated on or after January 1, 1973." [29] To support its contention that this standard is met, petitioner draws heavily on a policy determination made by the Commission in Opinion No. 567. [30] For several years prior to that decision, the Commission had utilized vintage-pricing in setting area gas rates, with vintages determined by contract date. [31] This methodology often resulted in assignment of an earlier vintage and its lower price to gas produced from wells drilled into new reservoirs during a later vintage period. Seeking in Opinion No. 567 to provide an incentive to maximize development of already-dedicated acreage, the Commission announced its view that "later-vintage prices should be applied to later discovered sources of gas even though the acreage upon which such gas is found was previously contracted"; [32] "production from newly discovered reservoirs on previously committed acreage," the Commission declared, "should have the price it would have if the contract had been dated coincident with discovery." [33] It thus became the Commission's policy "[i]n the Permian Basin and Southern Louisiana Areas [to assign] rate ceilings . . . by the date of dis-

covery of such reservoir, in lieu of the contract date, in the case of production on or after November 1, 1969, from a new reservoir on previously committed acreage." [34]

Petitioner argues that Opinion No. 567 obligated the Commission to regard its sales as though "the contract had been dated coincident with discovery." [35] While the Commission might have adopted this view of the matter, we cannot agree that it was compelled to do so. Like other administrative agencies, the Commission is empowered to formulate policy in the areas of its regulatory responsibility. This authority extends amply to changes in regulatory policy as the public interest may warrant. "Within the limits imposed by the requirement of reasoned decision-making," we have said, "the Commission is free to modify or even reverse its established policy." [36] It cannot be seriously suggested that the Commission is impotent to appropriately reshape its policies in its continuing endeavor to solve the Nation's critical gas shortage. [37]

In Opinion No. 699–H, decided before disposition of petitioner's claim, [38] the Commission expressly considered the role that the policy enunciated in Opinion No. 567 was to be allowed and restricted its operation to new-reservoir discoveries after January 1, 1973. [39] The merit in this limitation is obvi-

**29.** See text *supra* at notes 8–13.

**30.** *Hugoton-Anadarko Area Rate Proceeding* (Opinion No. 567), *supra* note 3, 42 F.P.C. at 729, discussed in text *infra* at notes 32–34.

**31.** For a fuller exposition, see *Public Serv. Comm'n v. FPC*, 177 U.S.App.D.C. 389, 396–399, 543 F.2d 874, 881–884 (1976) (Robinson, J., dissenting).

**32.** *Hugoton-Anadarko Area Rate Proceeding* (Opinion No. 567), *supra* note 3, 42 F.P.C. at 729.

**33.** *Id.*

**34.** *Id.* at 733. See also 18 C.F.R. § 2.56(f) (1976).

**35.** See text *supra* at note 33.

**36.** *Consolidated Gas Supply Corp. v. FPC*, 172 U.S.App.D.C. 162, 171, 520 F.2d 1176, 1185 (1975) (footnotes omitted). *Accord, Atlantic Seaboard Corp. v. FPC*, 131 U.S.App.D.C. 291,

296, 404 F.2d 1268, 1273 (1968); *City of Chicago v. FPC*, 128 U.S.App.D.C. 107, 115–116, 385 F.2d 629, 637–638 (1967), *cert. denied*, 390 U.S. 945, 88 S.Ct. 1028, 19 L.Ed.2d 1133 (1968).

**37.** *E. g., Consolidated Gas Supply Corp. v. FPC*, *supra* note 36, 172 U.S.App.D.C. at 171, 520 F.2d at 1185; *Public Serv. Comm'n v. FPC*, 167 U.S.App.D.C. 100, 115, 511 F.2d 338, 353 (1975). See also *Public Serv. Comm'n v. FPC*, *supra* note 31, 177 U.S.App.D.C. at 396–399, 543 F.2d at 881–884 (Robinson, J., dissenting).

**38.** Opinion No. 699–H was issued on December 4, 1974, after the Commission had initially rejected petitioner's rate-increase filing and while its petition for rehearing was pending.

**39.** The Commission said:
In Opinion No. 567, the Commission determined that newly discovered reservoirs located on acreage previously dedicated to interstate commerce would be entitled to the price which would otherwise be applicable to a

ous. Each of the other three classes of sales qualifying for the national rate was contingent upon events occurring on or after that date.[40] Furthermore, as the Commission stated, most instances of new-reservoir discovery would in any event fall within two of the three classes already entitled to the national rate.[41] What thus plainly emerges is that any favor extended to pre-1973 discoveries would have distorted an important element of the regulatory scheme—a new national rate to those entitled, effective January 1, 1973. We perceive nothing irrational in the Commission's decision to subject the new-reservoir-discovery add-on to the same temporal requirement imposed upon other events equally worthy of the rate increase. Nor can we nullify the Commission's action simply on the notion that situations involving no more than post-1973 deliveries somehow command disproportionate treatment.

That the Commission, in Opinion No. 699–H, deliberately departed from the policy articulated in Opinion No. 567 is further evident from its pronouncements in this very case. It said flatly that petitioner was "not entitled to the national rate ceiling under Opinion No. 699 based on the policy established in Opinion No. 567 with respect to sales from newly discovered reservoirs."[42] It declared emphatically that "Opinion No. 699 did not include within its coverage sales from newly discovered reservoirs unless such sales were otherwise covered by that opinion."[43] Lest the context of these statements be overlooked, we remind that when the Commission in Opinion No. 699–H modified Opinion No. 699 to extend the national rate to sales from newly-discovered reservoirs on previously dedicated acreage, it incorporated that action into a new regulation expressly limiting—as did Opinion No. 699–H itself—substitution of the discovery date for the contract date to discoveries made on or after January 1, 1973.[44] Petitioner disputes the implication that gas from new reservoirs can garner the national rate in no way other than as the regulation provides. It is a sufficient answer to point out that the Commission, measuring petitioner's bid by its new policy respecting newly-found reservoirs, unequivocally held that petitioner's "sales would not be covered inasmuch as the reservoir from which such sales are made was discovered prior to January 1, 1973."[45]

An agency's construction of its own regulation demands deference by the courts, and

---

contract dated as of the date of discovery except for the fact that the subject acreage had been dedicated under a contract in an earlier vintaging period. The Producers contend that we clarify Opinion No. 699 "by providing that Section 2.56 . . . be appropriately amended to provide for the application and interaction of the principles of Opinion No. 567 and that of the National Rate. . . ." We believe that this contention is well taken and it will be adopted as a modification of Section 2.56a (formerly Section 2.56(h) ).

We shall provide that reservoirs, discovered on or after January 1, 1973, as the result of a well commenced on or after January 1, 1973, on acreage dedicated to interstate commerce in such a manner that the sale would not otherwise come within the provisions of subsection 2.56a(a)(1), shall be entitled to the rate determined in this proceeding. In most situations, we believe that reservoirs discovered on or after January 1, 1973, on acreage committed under acreage dedications to interstate commerce prior to January 1, 1973, would come within the provisions of the first two classes of sales enumerated under Sec-

tion 2.56a(a)(1). There may, however, be cases where such would not be the case, and we will accordingly provide that these reservoirs will be entitled to the rate prescribed herein.

*Uniform National Rate for Sales of Natural Gas*, (Opinion No. 699–H), *supra* note 1, 52 F.P.C. at 1634 (footnote omitted) (opinion on rehearing).

40. See text *supra* at notes 7–13 and note 8 *supra*.

41. See note 39 *supra*. See also note 8 *supra* and accompanying text.

42. See text *supra* at note 28.

43. See text *supra* at note 28.

44. See text *supra* at note 12. The regulation simply codifies the Commission's determination in Opinion No. 699–H on this score. See note 39 *supra*.

45. See text *supra* at note 28.

is not to be upset unless inconsistent with the regulation or unreasonable.[46] We think there is no difference in the governing principle when the agency interprets a ruling generating a regulation in identical terms. We cannot say that the Commission's reading of its stated policy on new-reservoir discovery is arbitrary or disparate. Moreover, it is apparent that treatment of petitioner's sale as though made pursuant to a contract dated concomitantly with discovery of the new reservoirs—on June 1, 1972 [47]—and as if there had been no previous dedication of petitioner's acreage, would not of itself show entitlement to the national rate since the discovery occurred considerably prior to January 1, 1973. In an effort to bridge this gap, petitioner advances two additional contentions to which we now turn.

Admitting that its sale would not have qualified for the rate under Opinion No. 699's prescription—"sales . . . pursuant to contracts executed on or after January 1, 1973" [48]—petitioner adverts to the somewhat different language of Opinion No. 699–A granting the rate to "sales initiated on or after January 1, 1973, for the sale of natural gas in interstate commerce." [49] Petitioner asserts that "[t]his language applies directly to [petitioner's] sale here: the sale from [the new] [w]ells was initiated after January 1, 1973; and the gas produced from those wells had not previously been sold in interstate commerce." [50] It is evident, however, that petitioner deems a sale "initiated" when gas from a particular well is first delivered, while the Commission holds that delivery from any well on a dedicated tract "initiates" the sale of gas from any and all wells on that tract, save only as specified in the regulation pertaining to newly-found reservoirs.[51] Absent arbitrariness or inconsistency in the Commission's view—and we detect none—we are not at liberty to disregard it.[52]

Lastly, petitioner says that the Commission's ruling in the instant proceeding is at odds with its High Crest decision interpreting the relevant aspect of Opinion No. 699–A.[53] We do not agree. In that case, gas acreage was committed to the interstate market under pre-1973 contracts but no deliveries were made therefrom until after January 1 of that year.[54] The Commission held that the sales were "initiated after January 1, 1973," and thus were eligible for the national rate.[55] Contrastingly, in the instant case deliveries under the 1964 contract took place well before that date, and on that basis the Commission determined that petitioner's sale was not "initiated" after the relevant date.[56] We thus find High Crest plainly distinguishable from petitioner's situation, and thoroughly consistent with the Commission's decision therein.

In sum, by the Commission's interpretation of its national rate decisions and effectuating regulations, petitioner is foreclosed

46. *INS v. Stanisic*, 395 U.S. 62, 72, 89 S.Ct. 1519, 1525–1526, 23 L.Ed.2d 101, 109 (1969); *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–802, 13 L.Ed.2d 616, 625–626 (1965); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 413–414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700, 1702 (1945); *Gueory v. Hampton*, 167 U.S.App.D.C. 1, 4–5, 510 F.2d 1222, 1225–1226 (1974); *Gulf Oil Corp. v. Hickel*, 140 U.S.App. D.C. 368, 372–373, 435 F.2d 440, 444–445 (1970); *Udall v. Oelschlaeger*, 129 U.S.App. D.C. 13, 15, 389 F.2d 974, 976, *cert. denied*, 392 U.S. 909, 88 S.Ct. 2056, 20 L.Ed.2d 1367 (1968).

47. See note 14 *supra*.

48. See text *supra* at note 9.

49. See text *supra* at note 10.

50. Brief for Petitioner at 15.

51. That was the basis upon which the Commission denied petitioner the national gas rate. See text *supra* at note 28.

52. See cases cited *supra* note 46.

53. *High Crest Oils, Inc.*, *supra* note 5, Comm'n Apps. A, B. As to the problem generated by dissimilar administrative treatment of similar features, see *Garrett v. FCC*, 168 U.S.App.D.C. 266, 270, 513 F.2d 1056, 1060 (1975), and cases there cited at notes 23–26.

54. *High Crest Oils, Inc.*, *supra* note 5, Comm'n App. B at 1, 2.

55. *Id.*, Comm'n App. A at 2.

56. See text *supra* at note 28.

from the national rate. We find its construction neither inconsistent, unreasonable nor otherwise contrary to law. We thus conclude that its action must be sustained.

The orders under review are accordingly

*Affirmed.*