L'ENFANT PLAZA PROPERTIES, INC., et al., Appellants,

v.

DISTRICT OF COLUMBIA REDEVELOPMENT LAND AGENCY et al.

Johannes U. HOEBER et al., Appellants,

v.

DISTRICT OF COLUMBIA REDEVELOPMENT LAND AGENCY et al.

Nos. 76–1715 and 76–1721.

United States Court of Appeals, District of Columbia Circuit.

Argued March 31, 1977.

Decided Aug. 10, 1977.

Rehearing Denied Oct. 18, 1977.

Kenneth Wells Parkinson, Washington, D.C., with whom John S. Miles, Daggett H. Howard and Henry Roemer McPhee, Washington, D.C., were on the brief, for appellants in No. 76–1715.

Arthur H. Berndtson, Washington, D.C., for appellants in No. 76–1721.

Louis P. Robbins, Principal Asst. Corp. Counsel for the District of Columbia, Washington, D.C., with whom John R. Risher, Jr., Corp. Counsel, Richard W. Barton, Asst. Corp. Counsel, and Michael S. Levy, Sp. Asst. Corp. Counsel, Washington, D.C., were on the brief for appellee District of Columbia Council.

Anne S. Almy, Atty., Dept. of Justice, Washington, D.C., with whom Peter R. Taft, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., Nathan Dodell, Asst. U. S. Atty., and George R. Hyde, Atty., Dept. of Justice, Washington, D.C., were on the brief for Federal appellees.

B. Michael Rauh and Martin Shulman, Washington, D.C., filed a brief on behalf of Manglen Limited Partnership as amicus curiae urging affirmance.

Before TAMM and MacKINNON, Circuit Judges, and OLIVER GASCH,\* United States District Judge for the United States District Court for the District of Columbia.

Opinion for the court filed by MacKINNON, Circuit Judge.

MacKINNON, Circuit Judge:

Appellants in these consolidated cases are the owners and lessees of residential and commercial property in the Southwest Washington, D.C., Urban Renewal Project Area C.[1] The appellees, the District of Columbia Council, District of Columbia Redevelopment Land Agency (RLA), National Capital Planning Commission, and various officials, proposed two changes to the Project Area C redevelopment plan. One of the proposed changes would redesignate an as yet unused property from quasi-public

---

\* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1970).

1. The project area redevelopment plan at issue in the present case, the Urban Renewal Plan for the Southwest Urban Renewal Area Project C, J. App. 365–452, covers a large area comprising a substantial portion of Southwest Washington, D.C. See J.App. 369–70, 426–27. As of June 1974, shortly after this action was filed, there were 47 redevelopers in the project area who had acquired their interests from the RLA, 180 fee owners of townhouses, and over 400 condominium owners in the project area. NCPC Br. at 18–19.

The duration of the plan is 40 years from its adoption on November 30, 1956, J.App. 375, after which period the redevelopment process presumably will be supplanted by zoning and other land use controls.

(church and school) use to subsidized low- and moderate-income housing. The other proposed change would permit the expansion of a waterfront motel, the Channel Inn, from 100 to 150 rooms. Appellants brought suit in the district court seeking declaratory and injunctive relief, contending that the appellees are required by D.C. Code § 5–711 (1973) to secure their approval in writing before making any such changes in the project area plan, and that no attempt had been made to obtain their approval. Appellants also argued that the appellees in considering the proposed changes had improperly failed to follow the procedures applicable to "contested cases" under the District of Columbia Administrative Procedure Act, D.C. Code § 1–1502(8) (1973). After some preliminary matters, the district court stayed all discovery except requests for admissions, and subsequently granted appellees' motion for summary judgment and dismissed the complaint. This appeal resulted.

I

The District of Columbia Redevelopment Act of 1945, Pub.L. No. 79–592, 60 Stat. 790, *as amended* (codified at D.C.Code §§ 5–701 to 5–737 (1973 & Supp. IV 1977)), established the statutory framework for urban renewal in the District of Columbia, and it was within this framework that the redevelopment plan for the Southwest Urban Renewal Area Project C was adopted. An understanding of the Act is essential to the resolution of this case.

In section 2 of the Act, D.C.Code § 5–701, Congress found redevelopment of the "blighted" areas of the District of Columbia in order to provide safe and sanitary "low cost" housing to be necessary in the public interest, and a proper subject for the exercise of the police power. The Act then established an administrative scheme for the necessary planning and implementation to reach this goal. Section 6, D.C. Code § 5–705, directed the National Capital Park and Planning Commission, now the National Capital Planning Commission,[2] to develop a comprehensive plan for the District of Columbia to serve as a general guide to sound redevelopment. The Planning Commission is also directed to define the boundaries of specific urban renewal projects and to develop project area redevelopment plans for these specific projects. Each project area redevelopment plan must then be adopted both by the Planning Commission and by the District of Columbia Council.[3] The area plan is then referred to the Redevelopment Land Agency (RLA), the operating agency created by section 4 of the Act, D.C.Code § 5–703. Section 5, D.C.Code § 5–704, authorizes the RLA to acquire real property by purchase, exchange, eminent domain and other means.[4] It has the power to lease or sell acquired property in the project areas to private redevelopers under section 7, D.C.Code § 5–706. This section provides for the protection of the area redevelopment plans:

> . . . Every such lease and every contract of sale and deed shall provide that the lessee or purchaser shall (1) devote the real property to the uses specified in the approved project area redevelopment plan or approved modifications thereof; (2) begin within a reasonable time any

**2.** *See* D.C.Code § 1–1009 (1973). The National Capital Planning Commission consists of:

> (1) ex officio, the Secretary of the Interior, the Secretary of Defense, the Administrator of the General Services Administration, the Mayor, the Chairman of the Council of the District of Columbia and the chairmen of the committees on the District of Columbia of the Senate and the House of Representatives, or such alternates as each such person shall from time to time designate to serve in his stead, and in addition,
> (2) five citizens with experience in city or regional planning, three of whom shall be

appointed by the President and two of whom shall be appointed by the Mayor. . . . D.C.Code § 1–1002(b)(1)–(2) (Supp. IV 1977).

**3.** The District of Columbia Council was substituted for the District of Columbia Board of Commissioners by Reorg. Plan No. 3 of 1967, § 402 (122), D.C.Code Tit. 1 App. (1973).

**4.** This power was held constitutional, even as to property not itself blighted but essential to sound replanning, in *Berman v. Parker*, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954).

improvements on the real property required by the plan; and (3) comply with such other conditions as the Agency may find necessary to carry out the purposes of sections 5–701 to 5–719 . . . .. In the instrument, or instruments, of lease or sale, the Agency may include such other terms, conditions, and provisions as in its judgment will [further the goals of the Act], including provisions whereby the obligations to carry out and conform to the project area plan shall run with the land. . . .

D.C.Code § 5–706(d) (1973).

Additional protection for the integrity of the project area redevelopment plans is provided by section 11, D.C.Code § 5–710, which requires that the articles of incorporation or association of any private redevelopment company leasing or purchasing real estate in the project area provide that the company is without power to take action inconsistent with the project area redevelopment plan without a modification properly approved under section 5–711. Similarly, section 20 of the Act, D.C. Code § 5–718, protects approved project area redevelopment plans from violation or alteration by federal and District of Columbia Agencies,

unless such release, modification or departure be adopted by the [National Capital] Planning Commission and approved by the District Council in accordance with the provisions of section 5–711 or unless the modification or departure be approved by Act of Congress.

The procedures for modification of a project area redevelopment plan, which give rise to the issues in the present case, appear in section 12, D.C. Code § 5–711. This section, as amended, provides:

An approved project area redevelopment plan may be modified at any time or times: *Provided*, That any such modification *as it may affect* an area or part thereof which has been sold or leased shall not become effective without the consent in writing of the purchaser or lessee thereof: *Provided further*, That

such modification may be effected only through adoption by the [National Capital] Planning Commission and subsequent submission to any approval by the District of Columbia Council, as hereinafter provided. Before approval, the District Council shall hold a public hearing on the proposed modification after ten days' public notice. . . .

D.C.Code § 5–711 (1973) (emphasis added).[5]

II

The appellants' principal contention is that the first proviso to section 5–711 requires the appellees to seek, as a prerequisite to approval of any change in an area redevelopment plan, the written consents of all land purchasers and lessees within the project area whose interests the modification may "affect" in some substantial way. The appellees argue, on the contrary, that the language requires the consents only of the owners or lessees whose property is *directly* affected by a plan change. The district court noted that the statutory language on its face was susceptible of either reading, and that the legislative history was "inconclusive." The court therefore proceeded to constitutional and practical considerations. It adopted the appellees' narrow interpretation of the consent requirement, relying principally upon its conclusion that to construe the provision as urged by the appellants would render it an unconstitutional standardless delegation of legislative power.

This conclusion, the district Court held, was compelled by *Washington ex rel. Seattle Trust Co. v. Roberge*, 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed. 210 (1928), and *Eubank v. City of Richmond*, 226 U.S. 137, 33 S.Ct. 76, 57 L.Ed. 156 (1912). In each of these cases the Supreme Court held consent provisions contained in land use control ordinances to run afoul of the due process and equal protection guarantes of the fifth and fourteenth amendments. In *Eubank*, the Court struck down an ordinance that directed the city's committee on streets to establish a

---

**5.** This language was incorporated verbatim into Section K of the Urban Renewal Plan for the Southwest Urban Renewal Area Project C, J.App. 424–25.

building line, beyond which no structure could protrude, when requested by the owners of two-thirds of the property on one side of a block. In *Roberge*, the Court held invalid an ordinance permitting the erection of a philanthropic home in a residential district only when consent was obtained from the owners of two-thirds of the property within 400 feet. The Court in *Roberge* distinguished an intervening decision, *Thomas Cusack Co. v. City of Chicago*, 242 U.S. 526, 37 S.Ct. 190, 61 L.Ed. 472 (1917), which had upheld against constitutional attack an ordinance banning billboards from residential areas, but permitting owners of a majority of the frontage on a block to waive the restriction. *Cusack* had distinguished *Eubank* on the ground that the ordinance in *Cusack* did not permit property owners to *impose* a restriction upon their neighbors but rather permitted them to lift a restriction already validly applied by the municipality. *Roberge*, in turn, distinguished *Cusack* on the basis that there had been a showing in *Cusack*, but not in the later case, that the banned land use was in fact harmful to the public welfare. The district court in the present case concluded that *Roberge* severely limited the exception recognized in *Cusack*, and that under this rationale the standardless delegation that would result from appellants' construction of section 5–711 would clearly exceed constitutional bounds.

An initial problem with the district judge's rationale is that it is difficult to see why, on this reasoning, the delegation of the right to consent to the landowner *directly* affected is permissible while a similar delegation to his neighbors who are also affected by the change is not. But we need not resolve the difficult questions of line-drawing posed by the *Eubank, Cusack* and *Roberge* decisions. We entertain serious doubt whether this line of cases, dealing with the pure exercise of police power regulation, controls cases like the present one. The urban renewal program created by the

Redevelopment Act, of which the area redevelopment plan is an integral part, involves a much greater public role than do simple regulatory programs. The planning process underlying zoning and subdivision control normally consists only of the preparation of a single general plan, while in the redevelopment planning process both a general plan and a specific area redevelopment plan are prepared. The implementing agency, the RLA, does not simply designate particular land uses as appropriate or inappropriate to a locale, but takes affirmative steps to achieve the plan. The RLA purchases land with improvements through negotiation or eminent domain, clears the land and often realigns streets and utilities, and conveys the land, normally "writing down" its cost, to private or public redevelopers. In order to purchase such land from the RLA, a private purchaser must insert terms into its articles of incorporation or association that will disable it from taking actions inconsistent with the plan. In addition, the deed or lease agreement must contain terms assuring the implementation of the redevelopment plan, and the RLA may insert other conditions it deems desirable. All of these conditions may, at the option of RLA, run with the land.[6]

The entire redevelopment process resembles not so much the traditional exercise of the police power to control land use as it does a contractual arrangement binding a set of parties to take actions that are mutually beneficial. Whether or not nearby landowners in the project area are parties to whose benefit an enforceable covenant runs with the land, they could fairly be said to be third-party beneficiaries to a valid contract between the public bodies and any particular landowner. Redevelopers have made substantial investments in reliance upon this contractual arrangement, and the public has received corresponding benefit. The procedures for modifying plans imposed by section 5–711 are clearly part of

6. Appellants state that all of their deeds and leases contain provisions causing the restrictions to run with the land. L'Enfant Br. 14.

the agreement.[7] On this analysis, not only the right to consent to plan changes of any landowner "directly" affected, but also that of other landowners "affected" within the meaning of the statute, would survive constitutional attack.[8] We need not finally resolve this issue, however, since we conclude that the district court too quickly reached the constitutional question in determining the proper construction of the statute.

### III

Since the district court concluded that the statutory construction urged by the appellants would render the provision unconstitutional and was contrary to the public policy interest in promoting flexibility in urban redevelopment, it saw no need to permit full discovery or conduct a trial. The court accordingly stayed discovery, found no material issues of fact remaining after admissions, and granted appellees' motion for summary judgment. Finding material issues of fact remaining, we hold the grant of summary judgment in error.

■ Apart from contending that their position was supported by the facial language of section 5–711 and the legislative history, the appellants before the district court argued that their construction of the provision was consistent with the interpretation by the RLA itself from the initial

adoption of the project C area redevelopment plan in 1956[9] until an administrative about-face in 1967 or 1968. During this period, appellants averred, the Agency did in fact seek the consents of landowners in the project area before making changes in the project area plan. A number of changes were made under this procedure, appellants contend, showing that it was in fact workable. But more importantly, they urge that this practice, and appellees' practice since about 1968 of inserting waivers of any such right into deeds and lease agreements, was evidence of the interpretation of a statute by the agency primarily concerned with its interpretation. As such, they contend, it is relevant to the proper judicial interpretation of the statute. This is certainly correct as a general proposition. *See, e. g., Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944).

Although the question presented was somewhat different, this court recently noted the application of this general principal to the proper construction of the District of Columbia Redevelopment Act of 1945. In *L'Enfant Plaza North, Inc. v. District of Columbia Redevelopment Land Agency*, 141 U.S.App.D.C. 265, 437 F.2d 698 (1970), the appellants had argued that the appellees had changed their interpretation of the term "accessory uses" in the project area

---

**7.** While the RLA, Planning Commission and District of Columbia Council are limited to the procedures of section 5–711, however interpreted, Congress has expressly reserved to itself the right to modify the area plans or permit departures from them. D.C.Code § 5–718 (1973). Congress has already exercised this power. *See* Dwight D. Eisenhower Memorial Bicentennial Civic Center Act, 40 U.S.C. § 616(b)(2) (Supp. V 1975):

Notwithstanding the provisions of section 12 of the District of Columbia Redevelopment Act of 1945, as amended (D.C.Code, sec. 5–711), the urban renewal plan, approved pursuant to section 6(b)(2) of such Act (D.C.Code, sec. 5–705(b)(2)), for an urban renewal area in which the civic center is located shall be deemed to be modified by the plan approved pursuant to this subsection and the National Capital Planning Commission shall certify such urban renewal plan, as

modified, to the District of Columbia Redevelopment Land Agency.

**8.** If the provisions of the District of Columbia Redevelopment Act of 1945 give the purchasers and lessees a contractual right to the modification of the plan only through the procedures of section 5–711, and if the District of Columbia Council attempts to approve a plan modification without adherence to these procedures, the result might be a statutory impairment of contract in violation of U.S.Const., Art. I, § 10, cl. 1. *See United States Trust Co. of New York v. State of New Jersey*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). Even if the District is not a "state" within the meaning of the contract clause, *cf. District of Columbia v. Carter*, 409 U.S. 418, 420, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973), such an impairment would presumably constitute a due process violation.

**9.** J.App. 365.

plan so that a broader class of retail uses would be permitted in a proposed office building than had been anticipated by nearby redevelopers. The district Court had stayed discovery and granted summary judgment for the appellees, concluding that the agencies' interpretation of terms in the plan was *controlling* unless unreasonable. This court reversed, stating:

> Of course it is true that a highly relevant piece of evidence . . . is the interpretation made by a public body, such as the RLA, having official responsibilities for the implementation of the basic document . . . .
>
> [However, t]he error of the District Court's approach in this instance is that it foreclosed the receipt by the court of evidence conceivably related to the interpretation question. As noted above, appellants opposed the grant of summary judgment on the ground that there were disputed issues of fact which were material to the answering of that question. . . . Under our view, . . . relevant fact questions, such as whether RLA's recent interpretation is a departure from prior understanding of the "accessory use" restriction, and, if so, what considerations prompted that turnabout, do exist and should be explored by the District Court on remand. It goes without saying, of course, that evidence of the legislative history of the Act, and of the proceedings of the Planning Commission in preparing the Plan, would also be highly relevant.

141 U.S.App.D.C. at 269–70, 437 F.2d at 702–03 (footnotes omitted).

The same analysis is germane to the questions of interpretation presented in this case. While the early construction of the statutory terms by the appellees would not be binding on a reviewing court, such information should be considered by the court in reaching a proper result. The evidence in the record does not fully reveal the original interpretation of the proviso by the appellees, but suggests that they had interpreted it to require the consents of some class of owners and lessees beyond those "directly" affected by a plan change. The area plan itself reveals that the appellees sought letters of consent for plan changes from redevelopers in the area on a number of occasions between 1956 and 1965.[10] The number of consents suggests that in some cases redevelopers other than those "directly" affected were solicited. However, with one exception, it does not appear that all redevelopers in the project area were asked to consent to each plan change. This indicates that the agencies may have developed a workable test for distinguishing between those who were "affected" within the meaning of the statute and those who were not. Appellants also contend that when they agreed to purchase or lease property within the project area, appellees represented to them that their consent would be required before any changes could be made in the plan as it affected them.

It further appears from the area plan, however, that in a number of cases during the 1956–65 period no consents, or only those of landowners "directly affected," were sought. Since 1966 the appellees have consistently failed to seek consents for plan changes, except on one occasion when a

---

**10.** Twenty-three plan changes were documented in the area redevelopment plan as it appears in the record, with the last change approved on August 20, 1974. J.App. 428–52. Plan changes, with the number of consents obtained in parentheses, were as follows:

| | | |
|---|---|---|
| 1. | November 16, 1960 | (all purchasers and lessees) |
| 2. | December 20, 1960 | (3) |
| 3. | October 5, 1961 | (3) (directly affected only) |
| 4. | January 3, 1963 | (3) |
| 5. | August 7, 1963 | (8) |
| 6. | August 7, 1963 | (2) (directly affected only) |
| 7. | January 9, 1964 | (no consents) |
| 8. | January 9, 1964 | (1) |
| 9. | January 9, 1964 | (no consents) |
| 10. | May 18, 1964 | (no consents) |
| 11. | September 17, 1965 | (9) |
| 12. | September 30, 1965 | (7) |
| 13. | December 20, 1966 | (no consents) |
| 14. | June 27, 1967 | (no consents) |
| 15. | November 28, 1967 | (no consents) |
| 16. | September 14, 1967 | (no consents) |
| 17. | August 6, 1968 | (no consents) |
| 18. | December 17, 1969 | (no consents) |
| 19. | December 17, 1968 | (no consents) |
| 20. | December 17, 1969 | (no consents) |
| 21. | January 22, 1974 | (no consents) |
| 22. | May 7, 1974 | (no consents) |
| 23. | August 20, 1974 | (1) |

single consent was secured. Appellants aver that beginning about 1968, the appellees have inserted clauses into leases and deeds by which redevelopers have waived any right to consent to area plan changes. Appellees, in reply, concede that in several cases consents were sought from redevelopers not directly affected by plan changes, but explain that this was done simply as a matter of public relations.

This state of the record leaves unresolved at least the material issue of fact of the appellees' early interpretation of the second proviso to section 5–711. A collateral question, if the appellees in fact adhered to the interpretation now urged by appellants, is whether appellees had developed a practicable definition of the "effects" that would serve to identify the landowners and lessees with a statutory right to consent to plan changes. Resolution of these questions requires a remand for further discovery and a full hearing on the prior administrative interpretation of the consent provision and its effect upon the proper statutory interpretation.[11]

11. We agree with the district court that the statute is ambiguous on its face, and could be read to provide either a narrow or a broad right to consent to proposed plan changes. What is clear is that Congress intended to permit *some* purchasers and lessees within project areas to block plan changes by withholding their consents.

We also agree that the legislative history of section 5–711 does not resolve the issue of its interpretation, although reference to the history of the Act as a whole provides somewhat more insight into the meaning of section 5–711 than the district court gleaned from a more limited reading.

The bill that was enacted as the District of Columbia Redevelopment Act of 1945, S.1246, 79th Cong., 1st Sess. (1945), had been drafted as a compromise between two bills submitted earlier, S.13 and S.610, 79th Cong., 1st Sess. (1945). *See* S.Rep.No. 591, 79th Cong., 1st Sess. 1–2 (1945); H.R.Rep.No. 2465, 79th Cong., 2d Sess. 2 (1946). The Senate Committee hearings on the two predecessor bills, *Low-Cost Housing in District of Columbia: Hearings on S.13 and S.610 before a Subcomm. of the Senate Comm. on the District of Columbia*, 79th Cong., 1st Sess. (1945) (hereinafter *Senate Hearings*), reprint the two bills and indicate the areas of disagreement between the proponents of each. S.610 had been drafted by the National Capital Parks and Planning Commission and Alfred Betman, a noted city planning lawyer and draftsman of the Model City Planning and Model Zoning Enabling Acts. *See Senate Hearings, supra* at 36 (statement of Maj. Gen. U.S. Grant III); 160–61 (statement of Harlean James). The bill emphasized both public housing and private redevelopment for urban renewal land, and paid particular attention to the administrative workability of the redevelopment process. The opposing bill, S.13, which tracked the organization of S.610 section-by-section, was proposed by interests who favored deemphasis of public housing and increased focus on private redevelopment after public acquisition and clearance of renewal areas. The debate between partisans of both bills focused on the proper balance to be struck between public and private redevelopers. *See Senate Hearings* at 164–66 (statement of Charles H. Thompkins). As suggested by the caption of the hearings, it was assumed by all witnesses that the intent of the bills was "slum clearance" and the provision of improved "low cost" housing; commercial redevelopment and other types of housing were not mentioned. While speakers in favor of S.610 discussed the more flexible planning provisions of that bill in their arguments in favor of its passage, administrative provisions appeared not to be a concern of the supporters of S.13, whose principal concern appeared to be deemphasis of public housing. *See, e. g., Senate Hearings, supra* at 160–61 (statement of Harlean James), 164–66 (statement of Charles S. Thompkins), 221 (supplemental statement of Citizens Council for Community Planning). The enacted bill, S.1246, contained a number of compromises between the predecessor bills' relative emphasis on public versus private redevelopment.

The language of section 12 of S.1246 also differed somewhat from the corresponding language of S.13 and S.610. Section 11 of S.13 provided:

With respect to any portion or portions of a project area upon which construction in accordance with the redevelopment plan for such area shall not have started, an approved project area redevelopment plan may be modified at any time or times: *Provided*, that any such modification as it may *directly affect* an area or part thereof which has been sold or leased, shall not become effective without the consent in writing of the purchaser or lessee thereof. In addition to being consented to by the lessee or purchaser as provided herein any proposed modification shall satisfy the requirements provided in subsection 6 for approval of a redevelopment plan.

*Senate Hearings, supra* at 7; 91 Cong.Rec. 77 (1945) (emphasis added). Section 11 of S.610 provided:

An approved project area redevelopment plan may be modified at any time or times after the lease or sale of the area or part

thereof provided that the modification be consented to by the lessee or purchaser: *Provided further,* That the proposed modification be adopted by the Planning Commission and then submitted to the District Commissioners and approved by it. Before approval, the District Commissioners shall hold a public hearing on the proposed modification, notice of the time and place of which shall be given by mail sent at least ten days prior to the hearing to the then owners of the real properties in the project area and of the real properties immediately adjoining or across the street from the project area. . . .
*Id.* at 15; 91 Cong.Rec. 1350 (1945).

Only once in the Senate Hearings was the area redevelopment plan amendment procedure of section 11 mentioned In his second appearance before the Subcommittee, General Grant argued that plan changes should be permitted during construction, as well as earlier:

[C]hanges can be made in the plan under S.610 with the approval of the District Commissioners and the Planning Commission, and also of the purchaser. The purchaser would necessarily, having agreed to do a certain thing, have to be consulted and his concurrence would have to be obtained to any change in the plan, but he would usually be the one who wants the change in the plan for some very practical reason. He may wish to move the sewer line or change the street a little bit in order to make it a more practical development.

We believe the elastic feature in the plan is advantageous, whereas in Senate 13 the planning stops with the beginning of any construction on the project, and I think it will give rise to some practical difficulties which, I am sure, were not meant to be put in the way of private enterprise doing the job.
*Senate Hearings, supra* at 172 (statement of Maj. Gen. U.S. Grant III).

Appellants concede that under the unequivocal language of S.13, only the owner of property "directly" affected by a plan change would be required to consent to that change. They similarly concede that the somewhat more ambiguous language of S.610 also granted this right to landowners directly affected. This concession appears to be appropriate in view of General Grant's testimony.

They argue, however, that a different result is required by the language of section 12 of S.1246. The language of section 12 is virtually the same as that of section 11 of S.610, except that the class of persons with a right to object to proposed plan changes is qualified by the phrase "as it may affect." This language, appellants assert, expands the class of persons who must consent to such changes beyond those "directly" affected, to those others subjected to some "substantial" effect. They urge that this expansion was a quid pro quo for the rejection of the restrictive provision of S.13 that would have permitted no plan changes after construction had begun on a project.

Since both S.13 and S.610 were in agreement that consent should be required for plan changes once property had been leased or sold, but only the consent of those directly affected, the compromise suggested by the appellants would have been a curious one. As General Grant explained in his testimony, quoted above, rejection of S.13's limitation of amendments to the period before construction had begun was in the interest of both the planners and the redevelopers. The insertion of the phrase "as it may affect" might simply have been meant to indicate that at the time some sorts of changes were proposed, for example a change in building types or sizes permitted in an area or part of an area, the planners might not be able accurately to predict which developers "may [be directly] affect[ed]."

On the other hand, a broad look at the Act suggests that the Congress did not contemplate the course of urban renewal which actually developed, and that it may have intended to give the appellants the right to object which they now assert. The program envisioned by Congress was one principally aimed at the demolition and replacement of low-cost housing. The Act provided that the RLA could sell or lease a "project area" to a redevelopment company, Section 7(b), and then in a separate later section, almost as if an afterthought, provided that "[i]n lieu of the lease or sale of a project area as an entirety, the Agency shall have the power to lease or sell *parts* of such an area separately . . . ." Section 7(f) (emphasis added). This arrangement of the statutory language, together with the statements in the committee reports, suggests that the drafters of the bills had in mind a program quite different from that which actually developed. If they thought that sales of whole "areas" to individual developers would be the norm, and sales to multiple developers an exception, they must have envisioned project areas much smaller than that of Project C, which encompasses most of Southwest Washington, D. C. If a single developer controlled all or a large part of a project, any change of the plan for the area "may affect" him. More limited "project areas" would have been redeveloped much more quickly than Project Area C has been, and so problems of plan amendment would seldom have arisen after an initial redevelopment period. In contrast, the plan area in the instant case was very large, *see* note 1 *supra,* the plan period is forty years, and in 1977, over 20 years after the initial adoption of the area plan in 1956, there are still sizable unused parcels of property whose development under a changed plan could adversely "affect" other owners and lessees.

The large project area, together with the subdivision and sale of a number of redeveloped properties, has also greatly increased the number of persons who now assert a statutory right to object to proposed plan amendments. The

### IV

■ Appellants also argue that the district court erroneously held that the appellees should not be estopped from modifying their prior representations to appellants concerning the consent requirement of section 5–711. Appellants acknowledge the general rule that governments may not be ordinarily estopped by their past conduct from protecting the public interest, *see, e. g., Udall v. Oelschlaeger*, 129 U.S.App.D.C. 13, 16, 389 F.2d 974, 977 *cert. denied*, 392 U.S. 909, 88 S.Ct. 2056, 20 L.Ed.2d 1367 (1968). They argue, however, that the facts of the present case fall within the exception to that rule providing that a government may be estopped to alter its actions when such alteration would result in egregious injustice, *see, e. g., C. F. Lytle Co. v. Clark*, 491 F.2d 834, 838 (10th Cir. 1974) (dictum); *Smith v. District of Columbia Board of Zoning Adjustment*, 342 A.2d 356, 359 (D.C. App.1975). We seriously question whether the facts of the present case are sufficiently egregious as to fit within this exception to the general rule. However, the district court based its holding on this issue upon its conclusion that to find an estoppel would permit section 5–711 to operate in an unconstitutional fashion. Since in Part III, supra, we hold that the district court too quickly reached this conclusion, we remand.

### V

Finally, appellants contend that in passing upon the area redevelopment plan amendment, appellees were required to follow the "contested case" procedures of the District of Columbia Administrative Procedure Act (DCAPA), D.C.Code § 1–1501 to 1–1510 (Supp. IV 1977). Essentially for the reasons articulated by the district court, we reject this contention.

The procedures applicable to "contested cases" under the DCAPA are set out in D.C.Code § 1–1509, and generally resemble the "adjudication" procedures of the Federal Administrative Procedure Act, 5 U.S.C. § 554 (1970). In particular, the interested parties in a "contested case" are entitled to a trial-type hearing at which only they may participate, as opposed to a less formal "public" hearing of the type utilized in rulemaking. It is undisputed that the procedures followed in the present case would not satisfy the requirements of section 1–1509.

The situations to which the "contested case" procedures apply are set out in D.C. Code § 1–1502(8):

(8) the term "contested case" means a proceeding before the Mayor or any agency in which the legal rights, duties, or privileges of specific parties are required by any law (other than this chapter), or by constitutional right, to be determined after a hearing before the Mayor or before any agency . . . .

■ Despite the general language of section 1–1502(8), the fact that the statute provides a right to a hearing, as does section 5–711 here, is not dispositive of the question whether the proceeding is a "contested case." The question is whether the required hearing is in essence adjudicatory or legislative in nature. Section 5–711 here explicitly requires only a "public" hearing,

focus of the Act on "low-cost" housing, however, rather than upon the mixed-income residential and commercial development that has actually materialized, suggests that the drafters may have contemplated large rental projects that would remain in the hands of one or of a few redevelopers. The proliferation of owners by the creation of a large number of fee simple townhouses and condominiums in the project area, for example, was probably never envisioned.

It is possible that the section might be interpreted to require consents only from redevelopers who purchased or leased directly from the RLA, but it is equally likely that it should be construed to cover all "affected" owners and lessees, regardless of the source of their interests.

In summary, the drafters and the Congress may have granted a right to object to plan changes to a class of persons that turned out to be larger than was anticipated, for a much longer period than anticipated. But this would not be a reason to construe the statute to reach a narrower class. It would, rather, be a factor to be considered by Congress in determining whether to amend section 5–711 or to exercise its retained powers under section 5–718. *See* note 7 *supra*.

so if appellants are to prevail they must demonstrate that they have a constitutional due process right to an adjudicatory-type hearing. Appellants have not expressly sought to make such a showing, but have rested their argument upon several decisions of the District of Columbia Court of Appeals. We conclude, however, that the decisions of that court do not accord appellants a right to "contested case" treatment of area redevelopment plan modifications.

The District of Columbia Court of Appeals has generally considered administrative decisions dealing with land use control questions to involve general matters of public policy and therefore not to fall within the "contested case" provisions. This is true even where the issue is related only to a limited land area or even to a specific parcel of land. *See W. C. & A. N. Miller Development Co. v. District of Columbia Zoning Commission*, 340 A.2d 420 (D.C.App. 1975) (en banc); *Chevy Chase Citizens Assn. v. District of Columbia Council*, 327 A.2d 310 (D.C.App.1974) (en banc); *Citizens Assn. of Georgetown v. Washington*, 291 A.2d 699 (D.C.App.1972). The exceptions to this general line of authority are narrow. In *Dietrich v. District of Columbia Board of Zoning Adjustment*, 293 A.2d 470 (D.C.App. 1974), the D.C. Court of Appeals held that the question of the administrative grant of a "special exception" for a particular property was a "contested case." Similarly, in *Capitol Hill Restoration Society v. Zoning Commission*, 287 A.2d 101 (D.C.App.1972), that court held that the administrative application of "planned unit development" criteria to a particular property was a "contested case." In each of these cases, the question presented to the administrative body was not a broad question of public policy of the type involved in an urban renewal plan change, but a narrow question of administrative application of specific statutory criteria to the facts relating to a particular parcel of property. Under both "variance" and "planned unit development" procedures, the particular land uses or configurations are already established and criteria set out in the ordinance for application to specific properties; thus the questions

presented are adjudicatory rather than legislative in nature. The present case is therefore controlled not by *Dietrich* and *Capitol Hill*, but by the more general cases.

*Reversed and Remanded.*