**INTERNATIONAL ORGANIZATION OF MASTERS, MATES & PILOTS, Appellant,**

v.

**Honorable Harold BROWN, Secretary of Defense, et al.**

**No. 81–1250.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 21, 1982.

Decided Jan. 21, 1983.

Martin Shulman, with whom Benjamin L. Zelenko, Washington, D.C., was on brief, for appellant.

Leland Ware, Atty., Dept. of Justice, Washington, D.C., with whom Stanley S. Harris, U.S. Atty., and R. John Seibert, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellees.

Before WILKEY and WALD, Circuit Judges and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

This case is about the legality of a "pay cap" on the salaries of high ranking civilian mariners employed by the United States government. The statutory question is whether 5 U.S.C. § 5373,[1] which limits the basic rate of pay "fix[ed] by [executive branch] administrative action" to the maximum rate for grade GS–18, applies to 5 U.S.C. § 5348,[2] which requires the govern-

1. 5 U.S.C. § 5373, titled "Limitation on pay fixed by administrative action," states:

Except as provided by the Government Employees Salary Reform Act of 1964 (78 Stat. 400) and notwithstanding the provisions of other statutes, the head of an Executive agency or military department who is authorized to fix by administrative action the annual rate of basic pay for a position or employee may not fix the rate at more than the maximum rate for GS–18. This section does not impair the authorities provided by—

(1) section 1202 of the Panama Canal Act of 1979;

(2) sections 248, 481, and 1819 of title 12;

(3) section 831b of title 16; or

(4) sections 403a–403c, 403e–403h, and 403j of title 50.

2. 5 U.S.C. § 5348, titled "Crews of vessels," states:

(a) Except as provided by subsections (b) and (c) of this section, the pay of officers and members of crews of vessels excepted from

ment to fix the pay of its civilian mariners "as nearly as is consistent with the public interest in accordance with prevailing rates and practices in the maritime industry."

The International Organization of Masters, Mates & Pilots ("MM&P")[3] sought declaratory and injunctive relief in the district court against a binding determination by the Comptroller General, 56 Comp.Gen. 870 (1977), *reprinted in* Joint Appendix ("J.A.") at 31, that § 5373 does indeed limit the basic rate of pay of civilian mariners to the maximum GS–18 rate. The MM&P brought the action against the Secretaries of Defense, Navy, and Commerce; the Commanding Officer of the Military Sealift Command ("MSC"); the Administrator of the National Oceanic and Atmospheric Administration ("NOAA")—all in their official capacities as government employers of civilian mariners—as well as against the Comptroller General.

The MM&P now appeals from the district court's granting of the government's motions (1) to dismiss the action as to the Secretary of Commerce and the Administrator of the NOAA for lack of standing,[4] and (2) for summary judgment on the issue of whether the § 5373 "pay cap" applies to the mariners. *See International Organization of Masters, Mates & Pilots v. Hon. Harold Brown, et al.,* No. 79–1074 (D.D.C. Aug. 6, 1981), *reprinted in* J.A. at 114 [hereinafter cited as District Court Opinion]. Since the MM&P had undisputed standing to assert a claim against some government defendants, and since we affirm the district court's judgment against the MM&P on the merits of the action, we believe there is no need for us to review the dismissal for lack of standing.[5] As to the main cause of action, we find that the district court concluded correctly both that no material facts are in dispute, and that § 5373 limits the pay for mariners set pursuant to § 5348.

## I. Background

Before plunging into the intricacies of the mariners' pay-setting statute, § 5348, and of the pay cap contained in § 5373, it is useful to make three basic observations about the universe of federal pay systems and where this case fits with it. First, there are many different federal civilian pay systems. They include: the General Schedule ("GS") (the basic pay system for federal white-collar employees); the Foreign Service schedules; the schedules for

chapter 51 of this title by section 5102(c)(8) of this title shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates and practices in the maritime industry.

(b) Vessel employees of the Panama Canal Commission may be paid in accordance with the wage practices of the maritime industry.

(c) Vessel employees in an area where inadequate maritime industry practice exists and vessel employees of the Corps of Engineers shall have their pay fixed and adjusted under the provisions of this subchapter other than this section, as appropriate.

3. The International Organization of Masters, Mates & Pilots ("MM&P"), an unincorporated labor organization, is the collective bargaining representative for some of the civilian marine employees of the Department of Navy's Military Sealift Command ("MSC") and the National Atmospheric and Oceanic Administration ("NOAA"), a component of the Department of Commerce. Joint Appendix ("J.A.") at 4, 31.

4. The district court did not explain why it dismissed the action as to these defendants for lack of standing, *see* J.A. at 112, 114. However, the government supported its motion to dismiss with an affidavit declaring that the NOAA (which is part of the Department of Commerce) did not have any employees represented by the MM&P who would be affected by the GS–18 pay ceiling for the foreseeable future because their highest rates of compensation were still considerably below the pay cap. *See id.* at 548–549.

5. *See Watt v. Energy Action Educational Foundation,* 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 263–64 & n.9, 97 S.Ct. 555, 562–563 & n. 9, 50 L.Ed.2d 450 (1977). Since we have not addressed the standing issue, and have decided against the MM&P on the merits, we vacate the district court's order dismissing the action against the Secretary of Commerce and the Administrator of the NOAA for lack of standing, and direct the district court to dismiss the action against those two defendants based on our judgment in this case.

the Department of Medicine and Surgery at the Veterans' Administration; the U.S. Postal Service pay system (which includes a schedule determined through collective bargaining); the Executive Schedule (for key management and policymaking positions); the Federal Wage System (the basic pay system for blue-collar employees); and, depending on the degree of disaggregation, over forty other, separate pay systems. These pay systems vary considerably in numbers of employees covered and method of determining pay. *See Staff Report of the President's Panel on Federal Compensation,* 1–5, 159–62 (1976) ("*Rockefeller Report*").[6]

Second, although some pay systems are "linked" to one another, Congress has not fastidiously integrated all the systems to achieve uniform federal compensation policies. Instead, Congress has frequently, and sometimes haphazardly, soldered different pay ladders together at various points to construct a semblance of structure. Third, at times the alloys linking pay systems break under the stress of shifting salary scales or conflicting pay policy objectives.[7] This case involves one such crack in the amalgam.

The tension between § 5348 (the mariners' pay section) and § 5373 (the GS–18 pay cap section) surfaced in September 1975, when an NOAA employee requested advice from the Comptroller General[8] on the applicability of the § 5373 pay cap to seamen employed by the NOAA:

> At the present time, if we continue the present method of application of industry rates, as prescribed by [5 U.S.C. § 5348], some base salaries will exceed $36,000 [presumably, the then-current GS–18 maximum]. Our question is: "Does [5 U.S.C. § 5363, the prior codification of § 5373] entitled, 'Limitation on pay fixed by administrative action,' which limits basic pay to the maximum rate of GS–18, apply to salaries constructed under [5 U.S.C. § 5348]?"

J.A. at 73. The NOAA's letter noted that the MSC did not believe the limitation applied, and that the MSC had established rates of pay for its mariner employees in excess of the GS–18 cap. *Id.*

The Comptroller General asked for and received comments from the Defense Department, the Civil Service Commission (now the Office of Personnel Management), the Marine Engineers Beneficial Association, and the MM&P on the question posed by the NOAA. J.A. at 32–34, 37–50. All four organizations initially opined that the § 5373 cap did not apply to mariners whose pay is set in accordance with the prevailing rate provisions of § 5348.[9] *Id.* Nevertheless, the Comptroller General's Office concluded on August 9, 1977, "that pay for crews of vessels set under section 5348 constitutes pay fixed by administrative action as contemplated under section 5363 [now codified at § 5373] and that agency heads must set pay rates under section 5348 subject to an annual basic pay ceiling of the maximum rate for grade GS–18." J.A. at 36.

6. *See generally There's More to Federal Pay than the GS Schedule,* Wash.Post, Oct. 26, 1982, at A17, col. 1, which contains a "roll call" of some 50 federal pay systems.

7. *Cf. United States v. Clark,* 454 U.S. 555, 102 S.Ct. 805, 70 L.Ed.2d 768 (1982) (holding that 5 U.S.C. § 5334(b), "which requires a two-step pay increase for federal employes 'promoted ... to a position in a higher grade,'" does not apply to employees in the federal wage (prevailing rate) pay system who are promoted to positions in the GS pay system).

8. "The General Accounting Office [is] authorized to settle and adjust '[a]ll claims and demands whatever ... against [the Government]' ...." *Id.* at 566 n.16, 102 S.Ct. at 812 n.16 (quoting 31 U.S.C. §§ 71, 72). Under 31 U.S.C. § 74, "[d]isbursing officers ... may apply for and the Comptroller General shall render his decision upon any question involving a payment to be made by them ... which decision ... shall govern the General Accounting Office in passing upon the account."

9. After the MM&P initiated this action the Department of Defense and the Office of Personnel Management sent letters to the Department of Justice explaining that they had reversed their earlier positions, and now agreed with the Comptroller General's legal conclusion that the pay cap applied to the mariners. J.A. at 28–30.

The MM&P then filed a complaint for declaratory and injunctive relief against both the Comptroller's decision and the agency defendants' adherence to it. The MM&P alleged that the MSC and the NOAA were bound by statute and contract to pay the MM&P's members the rates received by private mariners. The MM&P also alleged that it had executed union contracts with both the MSC and the NOAA in reliance on prior government practice under § 5348. According to that practice, the MM&P maintained, the MSC and the NOAA had set government mariners' wages in line with the rates set in industry-wide agreements between the MM&P and commercial marine employers.

The MM&P then filed a request for production of documents relating to the government's past and present interpretation of both the relevant pay statutes and the collective bargaining arrangements. J.A. at 19–20. The government filed a motion to stay discovery, J.A. at 108, which the court granted on January 29, 1980, J.A. at 109. The government then moved to dismiss the Secretary of Commerce and the Administrator of the NOAA as defendants for lack of standing, and also moved for summary judgment as to the remaining government defendants. J.A. at 21. The district court's grant of the government's motions to dismiss and for summary judgment on December 23 and 31, 1980, respectively, gave rise to the present appeal.

## II. Analysis

### A. *Introduction*

We do not find a *direct* answer to the question of whether the § 5373 pay cap applies to government mariners whose pay is set in accordance with the prevailing rate provisions of § 5348 in the statutory language, legislative history, or case law. Instead, our conclusion that § 5373's pay limitation governs the mariners is rooted in a mix of all three sources of authority. We reach this result through a three-step process. First, to determine whether Congress probably intended the 1964 pay limitation to extend to the mariners' existing and separate pay statute, we review the legislative history of both statutes in the context of contemporaneous changes in the overall federal pay system. Second, since the cap applies to pay "fix[ed] by *administrative action,*" § 5373 (emphasis added), we must examine what Congress has, over time, considered this phrase to mean—to determine if the meaning includes the mariners' pay system. For this analysis, we turn to two sources: references to administrative pay-setting during Congress' 1972 overhaul of the prevailing wage rate system (which included the reenactment of the mariners' pay statute); and Congress' use of the term "administrative action" at other times to refer to prevailing wage rate systems like the mariners' pay statute. Third, we review judicial interpretations of the statutes establishing both the general prevailing wage rate system and the mariners' prevailing rate system to determine whether they have classified the type of pay-setting *discretion* involved in § 5348 as *administrative,* as opposed to *statutory* action. In addition, we examine but reject the MM&P's arguments that summary judgment was inappropriate on the record before the district court.

### B. *Legislative History of the Mariners' Pay System and the Pay Cap*

The present pay system for civilian crews of United States vessels has its origins in the Federal Employees Pay Act of 1945, Pub.L. No. 79–106, 59 Stat. 295, which stated at § 606, 59 Stat. 304 ("1945 Pay Act"):

> Employees of the Transportation Corps of the Army of the United States on vessels operated by the United States, ... and vessel employees of the Panama Railroad Company, *may* be compensated in accordance with the wage practices of the maritime industry.

(Emphasis added.) This statute suggested that the government officials should set mariners' pay after comparing prevailing private sector wages, but it did not *require* comparable pay. However, in the Classification Act of 1949, Pub.L. No. 81–429, 63 Stat. 954 ("1949 Classification Act"), Con-

gress amended the mariners' pay provision to make the prevailing rate system mandatory [10]:

> [The compensation of] officers and members of crews of vessels . . . *shall* be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with the prevailing rates and practices in the maritime industry[.]

1949 Classification Act, § 202(8), 63 Stat. 955 (emphasis added).

The 1949 amendment thus folded the mariners' pay system into that of "[t]he major prevailing-rate groups," the "trades, crafts, and labor employees." *See* H.R.Rep. No. 1264, 81st Cong., 1st Sess. 6 (1949) ("1949 House Report"), U.S.Code Cong. Serv. 1949, p. 2363; 1949 Classification Act, § 202(7)-(9), 63 Stat. 955. For over 120 years these primarily blue-collar federal employees have been paid according to the prevailing rate principle, *i.e.*, their wages are set at levels existing for *comparable work within each local wage area.* In contrast, the General Schedule and most other federal pay systems fix salaries by job category or grade, regardless of the region in which an employee works. *See Rockefeller Report* at 4, 27, 107.

In 1962,[11] Congress expanded the principle of comparability with private enterprise to guide federal white-collar pay policy as well, although the government performed the white-collar comparisons on a national rather than a local basis. *See Rockefeller Report* at 7–8. Putting the principle into practice for white-collar employees, however, took several years and a series of congressional pay act adjustments. One such statutory adjustment, the Government Employees Salary Reform Act of 1964, Pub.L. No. 88–426, 78 Stat. 400 ("1964 Salary Act"), included the pay cap now codified at 5 U.S.C. § 5373.

Congress enacted the pay cap as part of Title III of the 1964 Salary Act. Title III itself was known as the "Federal Executive Salary Act of 1964." 1964 Salary Act, § 301, 78 Stat. 415. Congress intended Title III both to raise and rationalize the salary structure for the key management and policymaking positions in the Federal Service. First, it "establishe[d] an orderly and rational series of five levels of executive compensation, bringing together into 1 system some 19 different pay levels established over the years, many by organic legislation establishing new agencies." S.Rep. No. 1121, 88th Cong., 2d Sess. 5 (1964) ("1964 S.Rep."), U.S.Code Cong. & Admin. News 1964, p. 2730, 2734. Next, it abolished much of the old hodgepodge of federal executive pay laws. Section 305 "repeal[ed] the Federal Executive Pay Act of 1956 and numerous other provisions of law which establish[ed] rates of compensation of heads of executive departments and other Federal officials." H.R.Rep. No. 1388, 88th Cong., 2d Sess. 32 (1964) ("1964 H.R.Rep."). Then Title III employed the GS–18 cap to ensure that the salaries of the new executive ranks remained above the pay of civil servants with special professional skills: "[S]ection 306 amend[ed] authority conferred upon heads of various agencies to set rates of compensation for certain positions of their agencies so as to provide that rates fixed by the heads of agencies shall not be in excess of the highest rate for grade 18 of the general schedule." *Id.* This *special* GS–18 cap section covered, for instance, U.S. Attorneys and Assistant U.S. Attor-

10. The main purpose of the 1949 Classification Act was "to simplify and to modernize the Classification Act of 1923, . . . which governs the pay rates and classifications of more than one-third of the employees in the Federal service." H.R.Rep. No. 1264, 81st Cong., 1st Sess. 2 (1949), U.S.Code Cong.Serv. 1949, p. 2363. The keystone of the 1949 Classification Act was the creation of the General Schedule ("GS"), *see id.; Rockefeller Report* at 1, the basic pay system for most executive branch white-collar employees.

11. Between 1949 and 1962, Congress adjusted most federal pay rates on an irregular basis. *Rockefeller Report* at 1. In addition, agencies changed the pay of their blue-collar employees in accordance with the prevailing rate principle, although the departments often used different methods to calculate the rates. *See id.* at 107. Finally, some agencies also set salary scales themselves pursuant to particular grants of pay-setting authority (*e.g.*, National Gallery of Art staff, 20 U.S.C. § 74(c); Tennessee Valley Authority employees, 16 U.S.C. § 831b).

neys; some scientific, engineering and administrative personnel at the National Aeronautics and Space Administration; a small number of people at the National Aeronautics and Space Council; and employees of the Advisory Commission on Intergovernmental Relations. H.R.Rep. No. 1647, 88th Cong., 2d Sess. 31–32 (1964) ("1964 Conf. Rep."). Finally, Congress appears to have devised § 308 as a "catch-all" provision to make sure that no other independent pay-setting authority, unless specifically excepted, could break through the GS–18 ceiling and invade the ranks of the new executive schedule:

> Section 308 prohibits any employee whose salary can be fixed by administrative action from receiving more than a GS–18. Excluded from this limitation are the Central Intelligence Agency, the Tennessee Valley Authority, the Federal Deposit Insurance Corporation, the Comptroller of the Currency, and the Federal Reserve Board.

1964 S.Rep. at 20, U.S.Code Cong. & Admin. News 1964, 2749.

We conclude from this complex legislative context, which spawned the pay cap provision, that Congress wanted to streamline its pay system for key executives and to fasten that system above the top rungs of the various civil service pay ladders. Apparently, Congress never focused directly on the relationship of its new executive pay system, protected by the GS–18 pay cap, and the mariners' prevailing wage rate system. This "oversight" is probably due to the fact that no one expected that the wages of these prevailing rate employees would ever be high enough to match the pay of top federal officials, most of whom are Presidential appointees.[12]

While obviously we cannot know if Congress would have wanted the pay cap to apply to the mariners had it considered the matter, we discern such an intent from the language of § 308 itself. First, § 308 begins "[e]xcept as provided by this Act and notwithstanding the provisions of any other law." This suggests that Congress wanted the pay cap to cut a wide swath. Second, Congress deliberately and expressly carved out certain exceptions to § 308 for certain pay-setting authorities, but did not exempt the mariners. Indeed, the legislative history of these exceptions reveals that Congress took up the subject of pay-cap exclusions at numerous times during passage of the 1964 Salary Act; the MM&P's ultimate failure to achieve exclusion of the mariners' pay certainly cannot be attributed to lack of opportunity to raise the issue.

Thus, in 1963, when the House Committee on Post Office and Civil Service reported the predecessor bill to the one enacted as the 1964 Salary Act, the § 308 cap contained only an exception for the Central Intelligence Agency. H.R.Rep. No. 899, 88th Cong., 1st Sess. 33 (1963). Six months later, the same House committee reported a successor bill and this time § 308 contained three more exceptions: for the pay-setting authorities of the Tennessee Valley Authority ("TVA"), the Federal Deposit Insurance Corporation, and the Comptroller of the Currency. 1964 H.R.Rep. at 34. The Senate added the Federal Reserve Board as a fifth exception, *see* 1964 S.Rep. at 20, to which the House acceded in conference, *see* 1964 Conf.Rep. at 36, 48. Of the five exemptions, the TVA is particularly noteworthy because the exception cites a statute, 16 U.S.C. § 831b, that requires the TVA to pay laborers and mechanics wages that are at least at the prevailing rate for work of a

12. To the degree the legislative history reveals any evidence of Congress' impression of where prevailing rate employees stood on the government's overall pay scale, it supports the conclusion that Congress assumed these employees were relatively low paid. In the House Report on the predecessor pay bill to the one passed by the House in 1964, the Committee on Post Office and Civil Service compared the federal blue-collar workers in the trades and crafts to "low-salaried postal and other Federal career employees." The purpose of the comparison was to emphasize that since both categories of workers had incomes that "place them in lower economic levels," Congress should treat them comparably and give the postal and other career employees pay increases already granted the blue-collar employees. *See* H.R.Rep. No. 899, 88th Cong., 1st Sess. 8 (1963).

similar nature in the vicinity.[13] Therefore, Congress exempted from the pay cap some workers whose pay was set in a manner similar to that employed for the mariners.

Even after the passage of § 308, Congress did not hesitate to add new exceptions to the GS–18 cap. In 1964, less than two months after Congress passed the pay cap, it added another exception for Panama Canal Zone employees. Act of Oct. 6, 1964, Pub.L. No. 88–631, § 3(e), 78 Stat. 1007, 1008.[14] This exception is also significant because Congress had often associated vessel employees of the Panama Railroad Company (later the Panama Canal Company, and now the Panama Canal Commission) with the mariners' pay system, beginning as far back as 1945. *See* 1945 Pay Act, § 606, 59 Stat. 304. Although the subsequent treatment of the two types of vessel employees had not been exactly parallel, Congress often considered their pay at the same time.[15] Therefore, Congress may have assumed that the cap applied to other government vessel employees when it removed the limit for Panama Canal employees.

Finally, Congress has very recently exempted a special pay system from the GS–18 cap. When it created the Senior Executive Service in 1978, it stated expressly that "[t]he payment of rates [for the Senior Executive Service] shall not be subject to the pay limitation of section . . . 5373 [the GS–18 cap] of this title." Pub.L. No. 95–454, § 407(a), 92 Stat. 1111, 1171 (1978) (codified at 5 U.S.C. § 5382(b)).

13. 16 U.S.C. § 831b states in part:

> The board [of the Tennessee Valley Authority] shall without regard to the provisions of Civil Service laws applicable to officers and employees of the United States, appoint such managers . . . employees . . . , and agents as are necessary for the transaction of its business, fix their compensation, define their duties, and provide a system of organization . . . .
>
> All contracts to which the Corporation is a party and which require the employment of laborers and mechanics . . . shall contain a provision that not less than the prevailing rate of wages for work of a similar nature prevailing in the vicinity shall be paid to such laborers or mechanics.
>
> In the event any dispute arises as to what are the prevailing rates of wages, the question shall be referred to the Secretary of Labor for determination . . . . In the determination of such prevailing rate or rates, due regard shall be given to those rates which have been secured through collective agreement by representatives of employers and employees.
>
> Where such work as [requires the employment of laborers and mechanics] is done directly by the Corporation the prevailing rate of wages [for work of a similar nature prevailing in the vicinity] shall be paid . . . .

14. These employees now work for the Panama Canal Commission. *See* 5 U.S.C. § 5373; 22 U.S.C. § 3642(a). It is likely that this exception from the pay cap also covers blue-collar personnel who would be under the prevailing wage rate system if they were treated like other federal employees. According to 22 U.S.C. § 3642(a):

> [T]he Panama Canal Commission may appoint without regard to the provisions of Title 5, relating to appointments in the competitive service, fix the compensation of, and define the authority and duties of, officers, agents, attorneys, and *employees* (other than the Administrator, Deputy Administrator, and Chief Engineer) *necessary for the* management, *operation, and maintenance of the Panama Canal and its complementary works, installations, and equipment.*

(Emphasis added.)

15. In 1945, Congress stated that both Transportation Corps and Panama Railroad Company vessel employees "may" be compensated in line with prevailing rates. 1945 Pay Act, § 606, 59 Stat. 304. In 1949, however, when Congress changed the prevailing rate connection for most government mariners from permissive to mandatory, it did not require that Panama Railroad Company vessel employees also receive prevailing rate pay. *See* Classification Act of 1949, Pub.L. No. 81–429, § 202, 63 Stat. 954, 955–56. Nevertheless, in the revision of title five of the U.S.Code in 1966, Congress joined in one code section the permissive prevailing rate system for the Panama Canal Company vessel employees with the mandatory prevailing rate system for other government mariners. H.R.Rep. No. 901, 89th Cong., 1st Sess. 79–80 (1965). Then, in the 92d Congress, the Senate wanted to amend the mariners' pay statute to *require* that Panama Canal vessel employees be paid "in accordance with the wage practices of the maritime industry," but the Senate receded from this position in conference. H.R.Rep. No. 1275, 92d Cong., 2d Sess. 3 (1972) (Conference Report), U.S.Code Cong. & Admin.News 1972, pp. 2980, 2996. Today, the pay requirements of the two groups of vessel employees are contained in separate subsections of § 5348.

In sum, since Congress acted explicitly to except so many groups of employees, one (and possibly two) of which includes prevailing rate employees like the mariners, it is unlikely that Congress silently intended an implicit exception from the same cap for the mariners. Thus, these exceptions, coupled with Congress' apparent intent to use the cap to protect the relative rank of its new executive salaries, lead us to conclude that Congress intended the mariners' pay to be subject to the GS–18 limitation.

C. *The Meaning of "Administrative Action"*

The MM&P makes the argument that Congress did not except the mariners from the pay cap because it did not assume the mariners' prevailing rate system came within the category of pay "fix[ed] by administrative action." However, two types of statutory evidence belie that theory. First, when Congress enacted a more detailed pay system for prevailing rate employees in 1972, *see* 5 U.S.C. §§ 5341–5349, its rhetoric strongly suggested that it considered the process of setting prevailing rate wages to involve administrative action. Since the mariners' wage statute, § 5348, approximates the basic prevailing rate statute *before* Congress' addition in 1972 of more detailed guiding principles, the mariners' pay statute would thus also seem to fall within the ambit of administrative action. Second, Congress has used the term "administrative action" in other statutes to refer to prevailing rate pay systems very similar to the mariners' system.

In general, the 1972 legislation established by statute a coordinated system for setting the prevailing wage rates of most federal blue-collar workers. *See* H.R.Rep. No. 339, 92d Cong., 1st Sess. 6–7 (1971) ("1971 H.R.Rep."); *Rockefeller Report* at 107–09. While the federal government had applied the prevailing rate principle to federal blue-collar workers for over a century, it had not used a uniform method for calculating prevailing rates. Different agencies often paid dissimilar rates for the same occupation in the same geographic area. To remedy these inequities, President Lyndon B. Johnson had initiated a coordinated federal wage system by memorandum in 1965. The 1972 prevailing rate legislation adapted this system and put it into statutory form.

There are a number of references to "administrative" pay-setting authority in the history of the 1972 prevailing rate legislation. We are, of course, cautious about using later legislative history to decide what Congress intended "administrative action" to mean in the 1964 Salary Act.[16] But we can and do rely on the 1972 legislative history to *reinforce* our conclusion that in 1964 Congress considered the mariners' prevailing rate system to be pay-setting by administrative action.

We note first that the problem President Johnson sought to remedy in 1965, and that Congress addressed by statute in 1972, was the fragmentation and nonuniformity of prevailing pay rates set by different administrative authorities, *i.e.,* each agency had its own wage board survey and system. Even after the President's memorandum (and then the 1972 legislation) established procedures for setting wages, an administrative authority still had to apply certain criteria in order to set prevailing rates. Thus, Congress understandably referred to

**16.** We note two particular caveats about using the history of the 1972 prevailing rate legislation to shed light on whether Congress intended to cap the mariners' pay in 1964. First, while in 1972 Congress incorporated the mariners' prevailing rate statute into the new subchapter on the prevailing wage pay system, *see* § 5348, it also stated that the rest of the subchapter "does not apply to officers and members of crews of vessels." *Id.* § 5342(b)(3). Second, some of the references to an administrative pay system in 1972 probably refer to the fact that the then-current coordinated wage system (initiated by President Johnson in 1965) was based only on executive, as opposed to statutory, authority. Proponents of the 1972 legislation basically wanted to put this executive branch policy into statutory form. This use of the word administrative to describe the authority upon which the coordinated pay system was based is not the same as stating that prevailing rate pay changes involve administrative (*i.e.,* agency) action.

the authorities in charge of prevailing rate systems as "a wage board or similar administrative authority serving the same purposes." 1971 H.R.Rep. at 21. Second, three statements on the floor of Congress in 1972 referring to the setting of prevailing rates as "administrative" action are instructive. Senator Gale McGee, the floor manager of the bill that became law (also Chairman of the Committee on Post Office and Civil Service), stated:

> Guidelines are established in this bill that shall direct the course of *administrative action* by the Civil Service Commission. The guidelines are not extensive. They will not bind the hands of the executive branch too firmly. But they will assure 650,000 blue-collar workers that ... there is a policy for the blue-collar employment system.

118 Cong.Rec. 21,017 (1972) (emphasis added). In the House, Representative Thomas Bevill, a cosponsor of the legislation, also noted that the authority to adjust prevailing wages was administrative:

> The [blue-collar] employees ... have a wage setting procedure that is almost entirely based on administrative authority [perhaps referring to the President's policy memorandum]. [M]any wage board employees ... want some form of congressional policy that has a guarantee that *administrative* changes must conform to certain basic principles now.

117 Cong.Rec. 27,680 (1971) (emphasis added). And Representative William Whitehurst, who had testified in favor of the legislation in committee, argued on the floor that "[f]or too many years, these employees ... have been under a pay system that ... has been unresponsive and subject to *administrative* inclination." *Id.* at 27,681 (emphasis added).

Finally, it is significant that these Congressmen were describing a pay system based on statutory language almost identical to that of the mariners' present pay statute. *See* 5 U.S.C. § 5341 (1970); 5 U.S.C. § 5348(a) (1976). That language required the pay of trades and crafts employees to be "fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates." *See* 1971 H.R.Rep. at 35 (quoting 5 U.S.C. § 5341 (1970)). Therefore, insofar as Congress considered this prevailing wage rate language to invoke administrative action, it would follow that the similar, unchanged language of the mariners' pay statute also involved, and continues to involve, administrative action.[17]

The 1972 legislative history is by no means our sole support for the conclusion that Congress swept the mariners under the pay cap in 1964 when it limited pay set by "administrative action"; we can also draw on Congress' use of "administrative action" in similar settings. Four types of statutory evidence support the conclusion that the mariners' pay system is encompassed by the term "administrative action."

First, while Congress has not defined explicitly what an administrative pay system is, it has defined the term "statutory pay system." *See* 5 U.S.C. § 5301(c). Therefore, one might reasonably infer that pay systems that Congress has not made statutory are necessarily administrative. This reasoning has a special allure because the three pay systems Congress now defines as statutory in § 5301(c) (the General Sched-

17. The old prevailing rate language is not exactly the same as 5 U.S.C. § 5348, which refers to "prevailing rates *and practices in the maritime industry.*" *Id.* (emphasis added). It is possible that Congress believed that this reference to pay practices in a specific industry made the directions in the mariners' pay statute more precise (and thus less administrative), than the statute that covered other federal blue-collar workers. But it is more likely that Congress never considered such distinctions. Furthermore, § 5348's directions on pay-setting for the mariners have not turned out to be easy to implement. *See Blaha v. United States,* 511 F.2d 1165 (Ct.Cl.1975), app. at 1172 (Navy Statement) ("From the very beginning of its existence MSC had difficulty in determining the 'prevailing rates and practices' of the maritime industry for the simple reason that there was, and still is, no single uniform rate or practice in the industry."). We conclude that even though the pay comparisons between private and government mariners may not have produced great variances, the mariners' pay-setting process involved enough discretion to deserve the "administrative action" label.

ule, the Foreign Service system, and the system for the Department of Medicine and Surgery of the Veterans Administration) composed three of "the four civilian statutory pay systems," 1964 S.Rep. at 1, U.S. Code Cong. & Admin.News 1964, p. 2730, that Congress adjusted in 1964 when it created the pay cap.[18] One of Congress' purposes in 1964 was "[t]o provide a logical and appropriate relationship between career salaries paid under the four civilian statutory pay systems and compensation for top positions in the three branches." *Id.*, U.S.Code Cong. & Admin.News 1964, p. 2730. Since Congress related the *statutory* pay systems to one another and to salaries for high officials, it follows that Congress used the GS–18 cap for pay by *administrative* (non-statutory) *action* to help integrate the *statutory* and *non-statutory* pay systems. This minimal integration at least ensured that non-statutory (*i.e.*, administrative) pay would not match executive pay.[19]

Second, 5 U.S.C. §§ 5305, 5307 underscore Congress' design, like that of Pope Alexander VI in dividing the globe between Spanish and Portuguese mariners,[20] to divide the federal pay world into statutory and administrative systems, with prevailing rate employees as a subset of the latter. In general, § 5305 directs the President to adjust annually the pay rates of each statutory pay system after considering both a special pay report and the recommendations of the Advisory Committee on Federal Pay, *see id.* § 5306. Section 5307 provides authority for adjustments, in keeping with those under § 5305, in the pay of employees whose pay is set by administrative action.[21] However, § 5307(c) states that the section does not authorize rate adjustments for prevailing rate employees. The inference we draw from this exclusion is that the pay of prevailing rate employees *is* fixed by administrative action, *but* that automatic annual adjustments in line with changes in the statutory systems would be inappropriate for them because their adjustments are already linked to prevailing nongovernment rates. The prevailing rate wage system already has a mechanism for frequent, regular wage changes; if wages were also adjusted when the federal government adjusts the statutory schedules, the prevailing rate employees would be traveling on two

**18.** The fourth statutory pay system that Congress adjusted in 1964 was for the Postal Field Service. When Congress enacted the legislation creating the U.S. Postal Service in 1970, it changed the pay system for postal workers. Most postal employees now have their pay determined through collective bargaining. *See* 39 U.S.C. §§ 1003, 1201–1209; *Rockefeller Report* at 3.

**19.** We recognize that this inference of a dichotomy between statutory and administrative pay systems is weakened by the fact that the definition of statutory pay systems in 5 U.S.C. § 5301(c) only applies to Subchapter I, "Pay Comparability System," *see id.* §§ 5301–5308. Therefore, the definition of § 5301(c) need not control the pay cap, *id.* § 5373, in Subchapter VII, "Miscellaneous Provisions," nor the mariners' pay, *id.* § 5348, in Subchapter IV, "Prevailing Rate Systems." Nevertheless, as our subsequent discussion of *id.* § 5307 (also in Subchapter I) points out, Congress seemed to recognize the basic division between statutory and administrative pay systems, and treated prevailing rate pay-setting as a type of administrative authority.

**20.** After Columbus' first voyage to the "New World" in 1492, the Portuguese charged that the Spaniards had encroached on an area in the Atlantic reserved for them by a previous treaty. The Castilian monarchs responded by seeking help from Pope Alexander VI, also a Spaniard. The pontiff issued a series of bulls in 1493 that established a line of demarcation between the two realms of exploration. In 1494, in the Treaty of Tordesillas, the Spanish and Portuguese accepted the principle of the papal division but moved the line farther west. *See* 10 *Encyclopaedia Britannica Macropaedia* 691h (1974) (describing Latin America and the Caribbean, Colonial).

**21.** The Conference Report stated that the primary purpose of § 5307(a):

> is to authorize administrative pay-fixing authorities to make adjustments in rates of pay, minimum or maximum rates of pay, and pay limitations or allowances, without regard to the antideficiency appropriation provisions of 31 U.S.C. 665, which prohibit administrative action from being taken to incur an obligation of funds in excess of the amount of funds available to cover the obligation.

H.R.Rep. No. 1685, 91st Cong., 2d Sess. 18 (1970) U.S.Code Cong. & Admin.News 1970, pp. 5915, 5925.

income escalators. This inference is supported by the Conference Report's discussion of § 5307: "The provisions of section 5307(a) are ... all inclusive insofar as applicable administrative pay-fixing authorities are concerned, except as to certain employees of the Senate and the House of Representatives and wage board [prevailing rate] employees." H.R.Rep. No. 1685, 91st Cong., 2d Sess. 19 (1970), U.S.Code Cong. & Admin.News 1970, p. 5925. Thus, Congress considered prevailing rate employees to be among those whose pay is fixed by administrative authority and it had to exclude them specifically from that general group for the purposes of the § 5307 adjustments.

Third, in a number of statutes relating to pay and working conditions, Congress uses the term "administrative authority" to refer to agencies' power to set wages in accordance with prevailing rates. For example, in discussing rates for supervisors of prevailing rate employees, Congress describes the prevailing rate personnel as "employees whose pay is fixed and adjusted from time to time by wage boards or *similar administrative authority* as nearly as is consistent with the public interest in accordance with prevailing rates." 5 U.S.C. § 5333(b) (emphasis added). Similarly, *id.* §§ 5544(a), 6101(a)(1) refer to prevailing rate employees whose pay is set "under section 5343 or 5349 of [Title 5], or by a wage board or similar *administrative authority* serving the same purpose," in the contexts of how to compute overtime rates (§ 5544) and the scheduling of the 40-hour workweek (§ 6101). (Emphasis added.) These sections underscore Congress' general belief that prevailing rate systems involve administrative action.

Finally, two recent congressional enactments are noteworthy with respect to the MM&P's argument that Congress could not have intended the administrative action of § 5373 to refer to the mariners because the cap would result in a shortage of qualified marine employees. Despite the obvious importance of the mariners' services to the government, Congress has explicitly limited their pay increases for the past two fiscal years. *See* Pub.L. No. 97-35, § 1701(b)(1), 95 Stat. 357, 754 (Omnibus Budget Reconciliation Act of 1981) (wage adjustment not to exceed 4.8% during fiscal year 1982); Pub.L. No. 96-369, § 114(a), 94 Stat. 1351, 1356 (Joint Resolution on Continuing Appropriations) (1980) (wage rate adjustments during fiscal year 1981 limited to 75% of the rate that would have been payable, and to the overall average percentage adjustment in the General Schedule for the fiscal year). If Congress is willing to limit the wage increases of all government mariners, it surely would not have balked at putting a ceiling on their pay scale by linking it to the highest GS grade.

In sum, the statutory evidence reveals three important, interlocking supports for our finding that the mariners' prevailing rate wage system is pay fixed by "administrative action" and therefore limited by § 5373. First, Congress seems to label federal pay systems as either statutory or administrative, with the former composed of a few major schedules set out in statutes. Second, both the history of the 1972 prevailing rate legislation and other statutes relating to pay and working conditions refer to prevailing rate pay-setting systems, like the mariners' statute, as pay adjusted by *administrative* authority. Third, Congress has been willing to limit the pay raises of all mariners as part of government-wide economy measures; thus, it has given a signal that the mariners' administrative pay system does not warrant unique treatment so far as pay limits are concerned. Based on all these considerations, we conclude that Congress' post-1964 actions and statements sustain our interpretation of the 1964 Salary Act—that the mariners' pay is set by administrative action, and is thereby covered by § 5373's cap.

### D. *Pay-Setting Discretion and Administrative Action*

We next examine whether courts have interpreted prevailing wage rate systems in general, and the mariners' system in particular, to require administrative action. We conclude that the case law confers on the executive officials who set prevailing wage

rates the substantial, albeit not unlimited, degree of discretion that is commonly associated with "administrative action." The officials who set the mariners' rates have at least as much freedom as others who set prevailing rates. These officials determine the mariners' pay by balancing the sometimes countervailing statutory considerations of matching prevailing rates and setting wages "consistent with the public interest," *see* 5 U.S.C. § 5348, not by referring to a statutory schedule or exercising ministerial action.

We look first at two companion cases where we have already analyzed the extent of administrative discretion left to executives in setting prevailing rates under 5 U.S.C. §§ 5341, 5343. In *American Federation of Government Employees v. Campbell,* 659 F.2d 157 (D.C.Cir.1980), *cert. denied,* 454 U.S. 820, 102 S.Ct. 103, 70 L.Ed.2d 92 (1981), we examined the prevailing rate statutory system, 5 U.S.C. §§ 5341–5349, in the course of finding that an appropriations bill "effectively amended the prevailing rate statute covering appellant-employees to provide that their wages could not be increased by more than 5.5% in fiscal year 1979." 659 F.2d at 158. A premise of one of the employees' arguments was "that the prevailing rate statute leaves agency officials virtually no discretion in setting wage increases." *Id.* at 161. While we did not decide the precise scope of discretion available to agency officials under these statutes, we concluded that it "is greater than the [employees] would permit": The public interest clause "surely provides agency officials with some flexibility in setting wage increases." *Id.* at 163.

In the companion case of *National Federation of Federal Employees v. Brown,* 645 F.2d 1017 (D.C.Cir.1981), we defined more explicitly the scope of the discretion that agency pay-setters have under the "public interest" clauses of §§ 5341, 5343. In *National Federation,* the Secretary of Defense had relied on the "public interest" clauses to impose a 5.5% pay cap on prevailing rate workers who were not paid with funds appropriated by Congress. We concluded that the Secretary and other officials "may exercise discretion ... to alter the rates suggested by [wage surveys made pursuant to § 5343], provided they do so within the confines of the principles [enumerated in § 5341]." *Id.* at 1025.[22]

These two cases make clear that officials who set prevailing rate wages under the guidelines of § 5341 have some freedom to select the rates. It is therefore reasonable to label their action "administrative," rather than "statutory" or "ministerial". It follows, then, that the process of setting mariners' prevailing rate wages under § 5348 also involves administrative action.

The presumption that § 5348 wage-setting is flexible enough to be described as administrative action is also supported by a string of court of claims cases. Most recently, *National Maritime Union v. United States,* 682 F.2d 944 (Ct.Cl.1982), examined the extent to which the government can limit pay increases for mariners pursuant to the "public interest" phrase in § 5348. The core facts were similar to those in *National Federation of Federal Employees v. Brown:* Although Congress' appropriations acts did not specifically impose pay limitations on the mariners in fiscal years 1979 and 1980, certain executive agencies, pursuant to their prevailing rate pay-setting authority, applied the ceilings in force for other government employees to the mariners. The "public interest" justification was to support the President's anti-inflation program. The court of claims up-

22. The four policy principles Congress set out in 5 U.S.C. § 5341 are:

(1) there will be equal pay for substantially equal work for all prevailing rate employees who are working under similar conditions of employment in all agencies within the same local wage area;
(2) there will be relative differences in pay within a local wage area when there are substantial or recognizable differences in duties, responsibilities, and qualification requirements among positions;
(3) the level of rates of pay will be maintained in line with prevailing levels for comparable work within a local wage area; and
(4) the level of rates of pay will be maintained so as to attract and retain qualified prevailing rate employees.

held the pay ceilings, and interpreted the "public interest" proviso of § 5348 even more broadly than our interpretation of §§ 5341, 5343 in *National Federation of Federal Employees v. Brown.*[23] It found "very broad" discretion to set wages under section 5348(a). 682 F.2d at 955. "Unless there is a flagrant abuse of discretion, this court will not meddle in an *administrative wage-setting* process the supervision of which is committed by statute to the agency." *Id.* (footnote omitted) (emphasis added).

In reaching these conclusions, the court of claims relied extensively on its prior decisions interpreting § 5348(a) and its predecessors. In particular, the court noted three cases: *Daigle v. United States,* 217 Ct.Cl. 376 (1978);[24] *Blaha v. United States,* 511 F.2d 1165 (Ct.Cl.1975);[25] and *Daniels v. United States,* 407 F.2d 1345 (Ct.Cl.1969).[26] The court stated that each of these cases identified the "countervailing considerations" of "equality of pay" and rates "consistent with the public interest," which "create a kind of tension ... [that] provides the administrative discretion needed to operate efficiently a wage system." 682 F.2d at 949 (footnote omitted).[27]

Thus, the court of claims' decisions interpreting § 5348 and its forerunners make it clear to us that the mariners' pay is set by government agencies operating with significant discretion to balance competing statu-

**23.** The court of claims distinguished at length our holding in *National Federation of Federal Employees v. Brown,* 645 F.2d 1017 (D.C.Cir. 1981), in order to conclude that 5 U.S.C. §§ 5341, 5343 left the discretion inherent in *id.* § 5348 intact. We believe the same result might be reached through *id.* § 5342(b)(3), which states that "[t]his subchapter [*id.* §§ 5341–5349], except section 5348, does not apply to officers and members of crews of vessels." Therefore, the "public interest" proviso of § 5348 is not necessarily confined by the principles enumerated in § 5341. We also note that both the discretion under § 5348 found by the court of claims and the more limited discretion we found in § 5343 seem to qualify as administrative action for the purposes of this case.

**24.** In *Daigle,* the court decided that § 5348 did not require the MSC to adopt certain prevailing pay practices (*i.e.,* an overtime guarantee, allocation of premium pay, and a higher rate for service on automated ships with fewer crewmen). It held that when the government invoked the public interest clause in order to refuse to adopt these practices, the government was not acting in an arbitrary and capricious manner. However, it warned the government that "[i]n the future, ... we will expect express identification of the public interest clause at the [time the decision is made] as the source of authority for declining to follow a prevailing private sector pay practice." 217 Ct.Cl. at 387.

**25.** In *Blaha,* the court held that the Commerce Department abused its discretion under § 5348 when it refused to grant an increase in vacation pay already agreed to by the Navy, the mariners' union, and the commercial operators. *Blaha* was similar to the case before us in that in this case the Navy and Commerce Departments initially disagreed about the pay of government mariners. It was unlike the present case, however, in that it only involved one statute, § 5348, and focused on the pay-setting discretion left to the second agency that decides whether a private sector pay practice should be applied to government mariners. The court in *Blaha* found that the Commerce Department, as the second agency to act, was required to resolve the issue with the Navy or to obtain the decision of a common superior. Of course, the case before us is also distinguishable from *Blaha* because here the NOAA did raise the issue of statutory interpretation to a common superior, the Comptroller General, and eventually the agencies agreed on a common interpretation.

**26.** The court in *Daniels* began its analysis by stating that even the ships' pilots who brought the action had recognized that the mariners' pay statute (substantially the same as at present) "vest[ed] the Secretary of the Navy with great discretion in setting wages." 407 F.2d at 1347. It concluded that the Secretary's decisions on "what salary formula and base he should adopt" in setting the pilots' rates were not "so arbitrary as to be clearly wrong." *Id.*

**27.** *See also Benevento v. United States,* 461 F.2d 1316 (Ct.Cl.) (per curiam) (acting under "a broad congressional grant of administrative discretion," the government's choice of a "maritime industry" to use as the basis for setting prevailing rates was not arbitrary and capricious), *cert. denied,* 409 U.S. 1038, 93 S.Ct. 516, 34 L.Ed.2d 486 (1972); *Amell v. United States,* 390 F.2d 880 (Ct.Cl.) (the government, which fixes these mariners' wages by "*administrative action,*" was not arbitrary and capricious in refusing to grant wage increases to match increased pension plan contributions for private mariners) (emphasis added), *cert. denied,* 393 U.S. 852, 89 S.Ct. 88, 21 L.Ed.2d 122 (1968).

tory considerations. While the shoals of that administrative discretion may not be well charted, it is nevertheless evident that the channel exists. The latitude for executive officials to determine wage rates involves administrative action as that term is commonly understood and has been used in prior cases. Therefore, we have yet another basis for concluding that § 5348 pay-setting is "administrative action" subject to the § 5373 pay cap.

E. *Action on Summary Judgment*

The MM&P also appeals from the district court's decision to adjudicate this case on a motion for summary judgment.[28] The MM&P asserts that material facts are in dispute on two issues: (1) "whether government agency practice evidences any administrative discretion under § 5348 to ignore applicable industry wage rates," MM &P's Brief at 43; and (2) "whether defendants are estopped to impose a 'pay cap' under § 5373," *id.* at 46. The government treats both these allegations as attempts to fit this case into the mold of equitable estoppel. It then counters the MM&P by arguing that "estoppel is not a viable claim" in this case, Government's Brief at 17, and that in any event the MM&P failed either to document facts to counter the government's proof or to file an affidavit stating why it could not "present by affidavit facts essential to justify [its] opposition," Fed.R.Civ.P. 56(f).[29] Indeed, the MM&P relied on a Statement of Material Facts in Controversy, J.A. at 110–11, supported only by a note that explained why its preparation of affidavits had been hampered and that referred to the government's exhibits.[30] The MM&P did not seek to use Rule 56(f) to gain an opportunity to present us with material facts. And we have no evidence that the MM&P provided supplementary affidavits in the ten months between the filing of its "Statement" and the issuance of the district court's orders. Therefore, we must decide this issue on the basis of the parties' statements and the exhibits in the record. After examining this evidence, we agree with the district court that the MM&P did not present "any genuine issue of material fact." District Court Opinion at 1 n. **; J.A. at 114.

We look first at the MM&P's contention that there are facts "demonstrating that pay under § 5348 is not set as a matter of administrative discretion, but as a matter of statutory mandate." MM&P's Brief at 44. We conclude that the question of whether pay-setting under § 5348 involves the type of administrative action that Congress limited with the pay cap of § 5373 is ultimately one of law, not fact. Our earlier analysis examined cases on the *legal* issue of the extent of administrative discretion under § 5348, and then drew a *legal* conclusion about whether this discretion represented

28. On an appeal from a grant of summary judgment under Fed.R.Civ.P. 56, "we must determine if appellants failed to raise any 'genuine issue as to any material fact,' looking at the facts in the record in the light most favorable to the party opposing summary judgment." *Habib v. Raytheon Co.*, 616 F.2d 1204, 1208 (D.C.Cir.1980). *See United States v. Diebold,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam); *United States v. General Motors Corp.*, 518 F.2d 420 (D.C.Cir.1975).

29. Under Fed.R.Civ.P. 56(e), once a party makes and properly supports a motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of his pleading, but his response ... must set forth specific facts showing that there is a genuine issue for trial." But Rule 56(f) permits the court to order a continuance when an opposing party shows that he cannot at the time present "facts essential to justify his opposition."

30. The note to the MM&P's submission stated:

> Captain Patrick J. King, who signed the NOAA contract for the plaintiff union and who was at that time the union's Representative for Government Employees, recently suffered a heart attack. For that reason, and because of the retirement and/or absence from the jurisdiction of other persons, the preparation of affidavits in support of this and other factual issues has been hampered. Affidavits will be filed as promptly as they become available. The exhibits filed with defendants' motion, however, provide at least an initial basis for a finding of material facts in dispute, should the court reach that issue.

J.A. at 111.

the type of administrative action covered by § 5373. Moreover, to the extent that resolution of this legal question turns on agency practice,[31] we note that the MM&P has not pointed out any *material facts in dispute* about those practices. Both parties agree that the Defense Department and the Office of Personnel Management initially believed that the § 5373 cap did not apply to the mariners, that the NOAA disagreed, and that the Comptroller General, the official with legal authority to resolve the executive branch dispute, concluded that the cap applied to the mariners. *See* J.A. at 28–50, 73–74. The record even includes memoranda from the various agencies providing their *legal* analyses. *Id.* The undisputed fact that different agencies disagreed about a legal question does not in itself present any disputed material fact.

This case is certainly distinguishable from *L'Enfant Plaza Properties, Inc. v. District of Columbia Redevelopment Land Agency,* 564 F.2d 515 (D.C.Cir.1977), upon which the MM&P relies. In that case we dealt with a statute "ambiguous on its face" and with legislative history that did not "resolve the issue of [the statute's] interpretation." *Id.* at 522 n.11. This lack of authority had led the district court to rely on "constitutional and practical considerations" in interpreting the statute, *id.* at 518, a course of action we believed it took too hastily. We held that summary judgment was inappropriate because the record left unresolved "the material issue of fact of the [single responsible agency's] early interpretation" of the statute. *Id.* at 522. Since the district court's decision had been based in part on "practical considerations," we also wanted to resolve the factual issue of whether the agency's supposed earlier definition of the statute had been workable. *Id.* at 521–22.

In the case before us, in contrast, we know the conclusions and even the reasoning of the various agencies that have interpreted the statutes in question. Moreover, the statutes and legislative history in this case provide us more guidance on the relationship between § 5348 and § 5373 than the court had on the statutory question in *L'Enfant Plaza Properties.* And since the issues of administrative practicality and standardless delegation of legislative power have not arisen in this case, we of course find no need to explore factual disagreements on those points.

We also reject the MM&P's second argument that there are material facts in dispute on the issue of whether the government is estopped to impose the pay cap on the mariners. To establish an estoppel claim against the government, the MM &P would have to prove the traditional elements—"false representation, a purpose to invite action by the party to whom the representation was made, ignorance of the true facts by that party, and reliance," as well as establish "a showing of an injustice . . . and lack of undue damage to the public interest." *Hoeber v. District of Columbia Redevelopment Land Agency,* 483 F.Supp. 1356, 1365–66 (D.D.C.1980), *aff'd mem.,* 672 F.2d 894 (D.C.Cir.1981); *see United States v. Lazy F.C. Ranch,* 481 F.2d 985 (9th Cir. 1973).

These standards set a difficult course for the MM&P to navigate.[32] As we stated in *L'Enfant Plaza Properties,* the

31. *See, e.g., Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *National Wildlife Federation v. Gorsuch,* 693 F.2d 156 (D.C.Cir.1982); *L'Enfant Plaza Properties, Inc. v. District of Columbia Redevelopment Land Agency,* 564 F.2d 515 (D.C.Cir.1977).

32. We note that the court of claims has already mined the narrow channel through which the MM&P would seek to pass. In a number of cases dealing with the pay or benefits of government employees the court of claims has ruled "that the Government cannot be estopped by statements or actions of its agents from enforcing a law passed by Congress." *Brant v. United States,* 597 F.2d 716, 721 (Ct.Cl.1979) (citing *Montilla v. United States,* 457 F.2d 978 (Ct.Cl.1972); *Parker v. United States,* 461 F.2d 806 (Ct.Cl.1972)). We find it unnecessary to either accept or reject this broad "doctrine," which would appear to protect any and all executive actions taken pursuant to statutory authority from estoppel, but note, in passing, that it is not free from critics. *See, e.g.,* Note, *Equitable Estoppel of the Government,* 79 Colum.L.Rev. 551, 555 n.35 (1979).

general rule is that governments may not be estopped by their past conduct absent an alteration in action that "would result in egregious injustice." 564 F.2d at 524 (citations omitted). And only recently the Supreme Court, in an estoppel action dealing with Social Security benefits, reemphasized "the duty of all courts to observe the conditions defined by Congress for charging the public treasury." *Schweiker v. Hansen*, 450 U.S. 785, 788, 101 S.Ct. 1468, 1471, 67 L.Ed.2d 685 (1981) (per curiam) (quoting *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 385, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947)).

Of course, to avoid summary judgment the MM&P only has to establish material facts in dispute on the estoppel issue. But this is exactly what the MM&P has failed to do. It has not given us any evidence of a false representation by the government designed to invite action by an ignorant MM &P. It is especially obvious that the MM &P was not ignorant of the pay-setting process. Both the government and the MM &P were aware that the government set the mariners' pay pursuant to § 5348, not by bargaining, and that courts had found that this statute involved some discretion. At a minimum, the MM&P has known of the real possibility that the government might apply a pay cap to the mariners since the NOAA raised the issue in 1975. All subsequent contract negotiations and individual decisions to remain in government service had to be premised on that possibility. Furthermore, the MM&P has been aware for the past four fiscal years that the government has imposed, as discussed above, other types of restraints on all mariners' pay, either directly by statute or through administrative action in the "public interest."

In addition to the MM&P's substantial knowledge about the pay-setting process, it has not provided us any evidence of a government misrepresentation designed to invite action by the MM&P. The fact that the Navy paid some mariners more than the GS–18 pay ceiling certainly does not meet this test absent other evidence. The MM& P also has not given us any facts showing reliance to its detriment. Since the MM& P could not bargain over wages, it cannot assert that the government traded (and now reneges on) an uncapped pay level to reduce some other employee benefit. Presumably, the MM&P bargained as hard as it could for non-wage benefits regardless of wages, since the MM&P could not influence pay-setting. In sum, the MM&P has not even set forth facts establishing a basic estoppel claim,[33] much less one against the government. We surely find no facts on which we could base a finding of egregious injustice. To the contrary, we lack any evidence of what the MM&P would have done differently if it had definitely known earlier that the pay cap applied to its members.

### III. CONCLUSION

For the reasons set forth above, we find that the district court correctly ruled on summary judgment that § 5373's grade GS–18 pay cap limits the basic rate of pay for government mariners set pursuant to § 5348. Because the MM&P had undisputed standing to assert a claim against some government defendants, we find it unnecessary to decide the MM&P's standing to seek relief against the Secretary of Commerce and the Administrator of the NOAA. Therefore, we vacate the district court's order dismissing the action against those two government defendants for lack of standing, and direct the district court to dismiss the action against them on the basis of our judgment in this case. Otherwise, the district court's order granting summary judgment in favor of the government defendants is

*Affirmed.*

---

**33.** *Cf. Town House, Inc. v. Paulino*, 381 F.2d 811 (9th Cir.1967) (upholding summary judgment against an estoppel claim where the claimant failed to produce facts to controvert the moving party's case).